## PEREZ *v.* UNITED STATES

No. 600.   Argued March 22, 1971—Decided April 26, 1971

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEWART, J., filed a dissenting opinion, *post,* p. 157.

*Albert J. Krieger* argued the cause for petitioner. With him on the briefs was *Joel M. Finkelstein.*

*Solicitor General Griswold* argued the cause for the United States.   With him on the brief were *Assistant Attorney General Wilson, Beatrice Rosenberg,* and *Marshall Tamor Golding.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The question in this case is whether Title II of the Consumer Credit Protection Act, 82 Stat. 159, 18 U. S. C. § 891 *et seq.* (1964 ed., Supp. V), as construed and applied to petitioner, is a permissible exercise by Congress of its powers under the Commerce Clause of the Consti-

tution.   Petitioner's conviction after trial by jury and his sentence were affirmed by the Court of Appeals, one judge dissenting.   426 F. 2d 1073.   We granted the petition for a writ of certiorari because of the importance of the question presented.   400 U. S. 915.   We affirm that judgment.

Petitioner is one of the species commonly known as "loan sharks" which Congress found are in large part under the control of "organized crime." [1]   "Extortionate credit transactions" are defined as those characterized by the use or threat of the use of "violence or other criminal means" in enforcement.[2]   There was ample evidence showing petitioner was a "loan shark" who used the threat of violence as a method of collection.   He loaned

---

[1] Section 201 (a) of Title II contains the following findings by Congress:

"(1) Organized crime is interstate and international in character. Its activities involve many billions of dollars each year.   It is directly responsible for murders, willful injuries to person and property, corruption of officials, and terrorization of countless citizens.   A substantial part of the income of organized crime is generated by extortionate credit transactions.

"(2) Extortionate credit transactions are characterized by the use, or the express or implicit threat of the use, of violence or other criminal means to cause harm to person, reputation, or property as a means of enforcing repayment.   Among the factors which have rendered past efforts at prosecution almost wholly ineffective has been the existence of exclusionary rules of evidence stricter than necessary for the protection of constitutional rights.

"(3) Extortionate credit transactions are carried on to a substantial extent in interstate and foreign commerce and through the means and instrumentalities of such commerce.   Even where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce."

[2] Section 891 of 18 U. S. C. (1964 ed., Supp. V) provides in part:

"(6) An extortionate extension of credit is any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or

money to one Miranda, owner of a new butcher shop, making a $1,000 advance to be repaid in installments of $105 per week for 14 weeks. After paying at this rate for six or eight weeks, petitioner increased the weekly payment to $130. In two months Miranda asked for an additional loan of $2,000 which was made, the agreement being that Miranda was to pay $205 a week. In a few weeks petitioner increased the weekly payment to $330. When Miranda objected, petitioner told him about a customer who refused to pay and ended up in a hospital. So Miranda paid. In a few months petitioner increased his demands to $500 weekly which Miranda paid, only to be advised that at the end of the week petitioner would need $1,000. Miranda made that payment by not paying his suppliers; but, faced with a $1,000 payment the next week, he sold his butcher shop. Petitioner pursued Miranda, first making threats to Miranda's wife and then telling Miranda he could have him castrated. When Miranda did not make more payments, petitioner said he was turning over his collections to people who would not be nice but who would put him in the hospital if he did not pay. Negotiations went on, Miranda finally saying he could only pay $25 a week. Petitioner said that was not enough, that Miranda should steal or sell drugs if necessary to get the money to pay the loan, and that if he went to jail it would be better than going to a hospital with a broken back or legs. He added, "I could have sent you to the hospital, you and your family, any moment I want with my people."

Petitioner's arrest followed. Miranda, his wife, and an employee gave the evidence against petitioner who did

---

other criminal means to cause harm to the person, reputation, or property of any person.

"(7) An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

not testify or call any witnesses. Petitioner's attack was on the constitutionality of the Act, starting with a motion to dismiss the indictment.

The constitutional question is a substantial one.

Two "loan shark" amendments to the bill that became this Act were proposed in the House—one by Congressman Poff of Virginia, 114 Cong. Rec. 1605–1606 and another one by Congressman McDade of Pennsylvania. *Id.,* at 1609–1610.

The House debates include a long article from the New York Times Magazine for January 28, 1968, on the connection between the "loan shark" and organized crime. *Id.,* at 1428–1431. The gruesome and stirring episodes related have the following as a prelude:

> "The loan shark, then, is the indispensable 'money-mover' of the underworld. He takes 'black' money tainted by its derivation from the gambling or narcotics rackets and turns it 'white' by funneling it into channels of legitimate trade. In so doing, he exacts usurious interest that doubles the black-white money in no time; and, by his special decrees, by his imposition of impossible penalties, he greases the way for the underworld takeover of entire businesses." *Id.,* at 1429.

There were objections on constitutional grounds. Congressman Eckhardt of Texas said:

> "Should it become law, the amendment would take a long stride by the Federal Government toward occupying the field of general criminal law and toward exercising a general Federal police power; and it would permit prosecution in Federal as well as State courts of a typically State offense.
>
> .    .    .    .    .
>
> "I believe that Alexander Hamilton, though a federalist, would be astonished that such a deep entrenchment on the rights of the States in performing

their most fundamental function should come from the more conservative quarter of the House." *Id.,* at 1610.

Senator Proxmire presented to the Senate the Conference Report approving essentially the "loan shark" provision suggested by Congressman McDade, saying:

"Once again these provisions raised serious questions of Federal-State responsibilities. Nonetheless, because of the importance of the problem, the Senate conferees agreed to the House provision. Organized crime operates on a national scale. One of the principal sources of revenue of organized crime comes from loan sharking. If we are to win the battle against organized crime we must strike at their source of revenue and give the Justice Department additional tools to deal with the problem. The problem simply cannot be solved by the States alone. We must bring into play the full resources of the Federal Government." *Id.,* at 14490.

The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods (18 U. S. C. §§ 2312–2315) or of persons who have been kidnaped (18 U. S. C. § 1201). Second, protection of the instrumentalities of interstate commerce, as, for example, the destruction of an aircraft (18 U. S. C. § 32), or persons or things in commerce, as, for example, thefts from interstate shipments (18 U. S. C. § 659). Third, those activities affecting commerce. It is with this last category that we are here concerned.

Chief Justice Marshall in *Gibbons* v. *Ogden,* 9 Wheat. 1, 195, said:

"The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, and to

those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a State, then, may be considered as reserved for the State itself."

Decisions which followed departed from that view; but by the time of *United States* v. *Darby,* 312 U. S. 100, and *Wickard* v. *Filburn,* 317 U. S. 111, the broader view of the Commerce Clause announced by Chief Justice Marshall had been restored. Chief Justice Stone wrote for a unanimous Court in 1942 that Congress could provide for the regulation of the price of intrastate milk, the sale of which, in competition with interstate milk, affects the price structure and federal regulation of the latter. *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110. The commerce power, he said, "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *Id.,* at 119.

*Wickard* v. *Filburn,* 317 U. S. 111, soon followed in which a unanimous Court held that wheat grown wholly for home consumption was constitutionally within the scope of federal regulation of wheat production because, though never marketed interstate, it supplied the need of the grower which otherwise would be satisfied by his purchases in the open market.[3] We said:

"[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still,

---

[3] That decision has been followed: *Beckman* v. *Mall,* 317 U. S. 597; *Bender* v. *Wickard,* 319 U. S. 731; *United States* v. *Haley,* 358 U. S. 644; *United States* v. *Ohio,* 385 U. S. 9.

whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.' " 317 U. S., at 125.

In *United States* v. *Darby,* 312 U. S. 100, the decision sustaining an Act of Congress which prohibited the employment of workers in the production of goods "for interstate commerce" at other than prescribed wages and hours, *a class of activities* was held properly regulated by Congress without proof that the particular intrastate activity against which a sanction was laid had an effect on commerce. A unanimous Court said:

"Congress has sometimes left it to the courts to determine whether the intrastate activities have the prohibited effect on the commerce, as in the Sherman Act. It has sometimes left it to an administrative board or agency to determine whether the activities sought to be regulated or prohibited have such effect, as in the case of the Interstate Commerce Act, and the National Labor Relations Act, or whether they come within the statutory definition of the prohibited Act, as in the Federal Trade Commission Act. And sometimes Congress itself has said that a particular activity affects the commerce, as it did in the present Act, the Safety Appliance Act and the Railway Labor Act. In passing on the validity of legislation of the *class* last mentioned the only function of courts is to determine whether the particular activity regulated or prohibited is within the reach of the federal power." (Italics added.) *Id.,* at 120–121.

That case is particularly relevant here because it involved a criminal prosecution, a unanimous Court hold-

ing that the Act was "sufficiently definite to meet constitutional demands." *Id.,* at 125. Petitioner is clearly *a member of the class* which engages in "extortionate credit transactions" as defined by Congress [4] and the description of that class has the required definiteness.

It was the "class of activities" test which we employed in *Atlanta Motel* v. *United States,* 379 U. S. 241, to sustain an Act of Congress requiring hotel or motel accommodations for Negro guests. The Act declared that " 'any inn, hotel, motel, or other establishment which provides lodging to transient guests' affects commerce *per se." Id.,* at 247. That exercise of power under the Commerce Clause was sustained.

> "[O]ur people have become increasingly mobile with millions of people of all races traveling from State to State; . . . Negroes in particular have been the subject of discrimination in transient accommodations, having to travel great distances to secure the same; . . . often they have been unable to obtain accommodations and have had to call upon friends to put them up overnight . . . and . . . these conditions had become so acute as to require the listing of available lodging for Negroes in a special guidebook. . . ." *Id.,* at 252–253.

In a companion case, *Katzenbach* v. *McClung,* 379 U. S. 294, we ruled on the constitutionality of the restaurant provision of the same Civil Rights Act which regulated the restaurant "if . . . it serves or offers to serve interstate travelers or a substantial portion of the food which it serves . . . has moved in commerce." *Id.,* at 298. Apart from the effect on the flow of food in commerce to restaurants, we spoke of the restrictive

---

[4] See n. 2, *supra.*

effect of the exclusion of Negroes from restaurants on interstate travel by Negroes.

> "[T]here was an impressive array of testimony that discrimination in restaurants had a direct and highly restrictive effect upon interstate travel by Negroes. This resulted, it was said, because discriminatory practices prevent Negroes from buying prepared food served on the premises while on a trip, except in isolated and unkempt restaurants and under most unsatisfactory and often unpleasant conditions. This obviously discourages travel and obstructs interstate commerce for one can hardly travel without eating. Likewise, it was said, that discrimination deterred professional, as well as skilled, people from moving into areas where such practices occurred and thereby caused industry to be reluctant to establish there." *Id.*, at 300.

In emphasis of our position that it was the *class of activities* regulated that was the measure, we acknowledged that Congress appropriately considered the "total incidence" of the practice on commerce. *Id.*, at 301.

Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power "to excise, as trivial, individual instances" of the class. *Maryland* v. *Wirtz*, 392 U. S. 183, 193.

Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce. In an analogous situation, Mr. Justice Holmes, speaking for a unanimous Court, said: "[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so." *Westfall* v. *United States*, 274 U. S. 256, 259. In that case an officer of a state bank which was a member of the Federal Reserve System

issued a fraudulent certificate of deposit and paid it from the funds of the state bank. It was argued that there was no loss to the Reserve Bank. Mr. Justice Holmes replied, "But every fraud like the one before us weakens the member bank and therefore weakens the System." *Id.*, at 259. In the setting of the present case there is a tie-in between local loan sharks and interstate crime.

The findings by Congress are quite adequate on that ground. The McDade Amendment in the House, as already noted, was the one ultimately adopted. As stated by Congressman McDade it grew out of a "profound study of organized crime, its ramifications and its implications" undertaken by some 22 Congressmen in 1966–1967. 114 Cong. Rec. 14391. The results of that study were included in a report, The Urban Poor and Organized Crime, submitted to the House on August 29, 1967, which revealed that "organized crime takes over $350 million a year from America's poor through loan-sharking alone." See 113 Cong. Rec. 24460–24464. Congressman McDade also relied on The Challenge of Crime in a Free Society, A Report by the President's Commission on Law Enforcement and Administration of Justice (February 1967) which stated that loan sharking was "the second largest source of revenue for organized crime," *id.*, at 189, and is one way by which the underworld obtains control of legitimate businesses. *Id.*, at 190.

The Congress also knew about New York's Report, An Investigation of the Loan Shark Racket (1965). See 114 Cong. Rec. 1428–1431. That report shows the loan shark racket is controlled by organized criminal syndicates, either directly or in partnership with independent operators; that in most instances the racket is organized into three echelons, with the top underworld "bosses" providing the money to their principal "lieutenants,"

who in turn distribute the money to the "operators" who make the actual individual loans; that loan sharks serve as a source of funds to bookmakers, narcotics dealers, and other racketeers; that victims of the racket include all classes, rich and poor, businessmen and laborers; that the victims are often coerced into the commission of criminal acts in order to repay their loans; that through loan sharking the organized underworld has obtained control of legitimate businesses, including securities brokerages and banks which are then exploited; and that "[e]ven where extortionate credit transactions are purely intrastate in character, they nevertheless directly affect interstate and foreign commerce." [5]

Shortly before the Conference bill was adopted by Congress a Senate Committee had held hearings on loan sharking and that testimony was made available to members of the House. See 114 Cong. Rec. 14390.

The essence of all these reports and hearings was summarized and embodied in formal congressional findings. They supplied Congress with the knowledge that the loan shark racket provides organized crime with its second most lucrative source of revenue, exacts millions from the pockets of people, coerces its victims into the commission of crimes against property, and causes the takeover by racketeers of legitimate businesses. See generally 114 Cong. Rec. 14391, 14392, 14395, 14396.

We have mentioned in detail the economic, financial, and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particularized findings in order to legislate. We relate the history of the Act in detail to answer the impassioned plea of petitioner that all that is involved in loan

---

[5] See n. 1, *supra.*

sharking is a traditionally local activity. It appears, instead, that loan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations.

*Affirmed.*

MR. JUSTICE STEWART, dissenting.

Congress surely has power under the Commerce Clause to enact criminal laws to protect the instrumentalities of interstate commerce, to prohibit the misuse of the channels or facilities of interstate commerce, and to prohibit or regulate those intrastate activities that have a demonstrably substantial effect on interstate commerce. But under the statute before us a man can be convicted without any proof of interstate movement, of the use of the facilities of interstate commerce, or of facts showing that his conduct affected interstate commerce. I think the Framers of the Constitution never intended that the National Government might define as a crime and prosecute such wholly local activity through the enactment of federal criminal laws.

In order to sustain this law we would, in my view, have to be able at the least to say that Congress could rationally have concluded that loan sharking is an activity with interstate attributes that distinguish it in some substantial respect from other local crime. But it is not enough to say that loan sharking is a national problem, for all crime is a national problem. It is not enough to say that some loan sharking has interstate characteristics, for any crime may have an interstate setting. And the circumstance that loan sharking has an adverse impact on interstate business is not a distinguishing attribute, for interstate business suffers from

almost all criminal activity, be it shoplifting or violence in the streets.

Because I am unable to discern any rational distinction between loan sharking and other local crime, I cannot escape the conclusion that this statute was beyond the power of Congress to enact. The definition and prosecution of local, intrastate crime are reserved to the States under the Ninth and Tenth Amendments.