**UNITED STATES of America**

**v.**

**Dominick MENNUTI et al., Defendants.**

**No. 79 CR 679.**

United States District Court, E. D. New York.

April 3, 1980.

Edward R. Korman, U. S. Atty. by Steven G. Nelson, Asst. U. S. Atty., Brooklyn, N. Y., for plaintiff.

Tepper & Popkin, Hicksville, N. Y., for defendant Mennuti.

David W. Clayton, Shirley, N. Y., for defendants Roy and Tricoli.

Donald H. Birnbaum, Garden City, N. Y., for defendant Cruser.

T. M. Henderson, Mineola, N. Y., for defendant Natale.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge:

By an indictment filed December 19, 1979, defendants[1] were charged with conspiracy and substantive violations of 18 U.S.C. § 844(i),[2] which prohibits destruction (by means of an explosive) of property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce". At a conference held February 13, 1980, counsel for defendant Mennuti indicated that he would move to dismiss the indictment for lack of jurisdiction. He thereafter filed papers on March 3, 1980 which urge that the property involved in this case was not "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce".[3] By papers filed the same day, March 3, 1980, defendant Natale joined in defendant Mennuti's motion to dismiss the indictment.[4] For reasons set forth below, defendants' motion to dismiss the indictment for lack of jurisdiction is granted.

## THE FACTS

The Assistant United States Attorney has submitted an affidavit setting forth the government's view of the facts:

Counts One and Two of the indictment charge the defendants Mennuti, Cruser and Natale with conspiring to destroy, and actually destroying, a building located at 10 Yacht Street, Brookhaven, New York by means of an explosive. 10 Yacht Street, Brookhaven, was a one-family dwelling owned by Dominick Mennuti's wife, Anne Mennuti. During the period in question the dwelling was the actual residence of the Mennuti family. The mortgage financing the purchase of the house was held by the Union Savings Bank of Long Island, which conducted business in interstate commerce and whose business affected interstate commerce.[5]

The premises at 10 Yacht Street was insured by the Government Employees Insurance Company (Geico) and approximately Twenty-five Thousand ($25,-000.00) dollars was paid to Anne Mennuti by Geico in settlement of the insurance claim for the fire at 10 Yacht Street. The payments were made in the form of several checks which were drawn on out-of-state banks. Presumably, the mortgage holder, the Union Savings Bank of Long Island, was paid out of the proceeds of the insurance claim.

As noted in oral argument before the Court, the residence at 10 Yacht Street was constructed with various components

1. The indictment named five defendants. The charges against three defendants were the subject of plea agreements, leaving as defendants Dominick Mennuti and Victor Natale, the movants here.

2. The statute reads as follows:
   Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than 10 years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than 20 years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty, or to life imprisonment as provided in § 34 of this title.

3. The motion papers for defendant Mennuti raise a separate challenge to the application of § 844(i), arguing that the destruction of the properties was not "by means of an explosive" under § 844(i). Because the court is persuaded by Mennuti's first challenge to the sufficiency of the indictment, there is no need to reach his second challenge.

4. Defendant Natale also moves by separate notice of motion filed March 3, 1980 to suppress certain statement made to law enforcement officials. Because the indictment is held to be insufficient, there is no need to rule on defendant's suppression motion.

5. Defendants add that the Union Savings Bank of Long Island was "a local Suffolk County bank * * *. The bank's main office is located in Patchogue and it maintains branch offices in Coram, Huntington, Lake Grove, Rocky Point, Shirley, and Westhampton Beach." Affidavit of counsel for defendant Mennuti, ¶ 3. This addition is not material to the issues decided in this memorandum and order.

and materials, e. g., wood, glass and asphalt shingles, which are produced exclusively outside of New York state. Likewise, telephone lines, electric lines and other services provided at 10 Yacht Street travelled in interstate commerce and affected interstate commerce. Finally, of course, when the residence at 10 Yacht Street was destroyed, it was rebuilt, again through the use of building materials originating outside of New York state.

Counts Three and Four charge all five defendants with conspiring to destroy, and actually destroying, a building located at 26 Sally Lane, Ridge, New York. The building in question was a rental property owned by defendants Roy and Tricoli for rental to the public.[6] Those defendants advertised the property as a rental in a newspaper which travelled in interstate commerce, i. e., Newsday. The building was originally constructed of building materials originating outside of New York state, and after being repeatedly vandalized, was repaired with other materials coming from out of state. Likewise, utilities travelling in and affecting interstate commerce serviced the building at 26 Sally Lane. Finally, and most significantly, insurance proceeds for the claim relating to the destruction of 26 Sally Lane were paid by checks drawn on an out-of-state bank account in the name of Continental Casualty Insurance Company. Affidavit of Stephen Nelson, ¶¶ 3 through 6. (footnotes added)

The truth of these facts is accepted for purposes of the discussion which follows.

### THE LAW

The court is aware of no reported case in this circuit construing the jurisdictional boundaries of 18 U.S.C. § 844(i). However, the issue has been the subject of three recent appellate decisions elsewhere: *United States v. Sweet*, 548 F.2d 198 (CA7 1977), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52

L.Ed.2d 361 (1977); *United States v. Schwanke*, 598 F.2d 575 (CA10 1979), and *United States v. Grossman*, 608 F.2d 534 (CA4 1979).

In *Sweet*, defendants were indicted under 18 U.S.C. § 844(i) for destroying a competing local tavern, by means of railroad flares, bricks, and whiskey bottles filled with gasoline. Defendants argued that it was beyond the power of Congress to prohibit the acts in question.

The *Sweet* court began by quoting at length from the legislative history of § 844(i), including the following passage:

Section 844(i) proscribes the malicious damaging or destroying, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. Attempts would also be covered. Since the term affecting [interstate or foreign] "commerce" represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause", *NLRB v. Reliance Fuel Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963), this is a very broad provision covering substantially all business property. While this provision is broad, the committee believes that there is no question that it is a permissible exercise of Congress (sic) authority to regulate and to protect interstate and foreign commerce.

*United States v. Sweet, supra*, 548 F.2d at 200 (quoting House Report No. 91–1549, Organized Crime Control Act of 1970, 1970 U.S.Code Cong. & Admin. News at 4007, 4046) (brackets inserted by the *Sweet* court).

The court accepted the view expounded in the legislative history that the language of § 844(i) represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause" and determined the extent of § 844(i) jurisdiction by analyzing leading Commerce Clause cases

---

**6.** Defendants add that the mortgage on the building at 26 Sally Lane was "held by individuals named Michael and Madeline Mondola"; defendants fail to allege whether the mortga-gees are New York State residents. The identity and residence of the mortgagees, however, is immaterial to this decision.

on the Sherman Act, 15 U.S.C. §§ 1–7, and the Hobbs Act, 18 U.S.C. § 1951. The court then quoted from one of its own Hobbs Act decisions, *United States v. DeMet*, 486 F.2d 816 (CA7 1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974), as follows:

> Because Congress has seen fit to exercise its full power under the commerce clause, extortionate conduct having an arguably *de minimis* effect on commerce may nevertheless be punished. *United States v. Sweet, supra,* 548 F.2d at 202.

The *Sweet* court found the *DeMet "de minimis"* standard to be applicable to cases under § 844(i) as well as to cases under the Hobbs Act:

> Both statutes punish unlawful acts which affect commerce. The effect on commerce was the concern of *DeMet.* In holding as we do, we are, therefore, not stretching federal jurisdiction as defendants argue. Any stretching that there may have been in this area was long ago accomplished. Nor do we discount the wisdom of some restraint succinctly enunciated in Mr. Justice Stewart's dissent in *Perez* [402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971)]. *Id.*

The court held that the bombing of the tavern had on interstate commerce at least a *de minimis* effect sufficient to sustain jurisdiction under the Commerce Clause and § 844(i).

The next appellate construction of § 844(i) occurred in *United States v. Schwanke, supra*, where defendants were indicted for dynamiting a building "then being used for commercial business purposes". Defendants did not dispute that a business with interstate connections had been located in the destroyed building. However, defendants nonetheless moved to dismiss the indictment for lack of jurisdiction, arguing that

> [U]nder § 844(i) the nexus establishing or affecting interstate commerce must be a person engaged in organized crime to avoid the implication that Congress was not invading traditional state criminal jurisdiction. *United States v. Schwanke,* 598 F.2d at 578.

Rejecting this argument, the Tenth Circuit panel in *Schwanke* followed *Sweet* in giving a broad construction to § 844(i):

> We do not accept Schwanke's construction of § 844(i). We do not find anything in the legislative history of the statute supportive of his contention. Congress has the power to punish the unlawful use of explosives under the Commerce Clause even though the effect on interstate commerce may be *de minimis.* [citation to *United States v. Sweet* omitted].

> We hold that the government's evidence against Schwanke adequately established jurisdiction giving rise to a criminal violation under § 844(i). *Id.*

The most recent appellate construction of § 844(i) occurred in *United States v. Grossman, supra*, where defendants were indicted for conspiracy to destroy by means of an explosive a hydraulic excavator (back hoe). Defendants moved to dismiss the indictment for lack of jurisdiction, arguing that the back hoe was not being used in interstate commerce at the time it was destroyed. The Fourth Circuit rejected this argument, relying on the legislative history and the decisions in *Sweet* and *Schwanke*:

> We are in accord with the conclusion of [the Seventh and Tenth] circuits that in using the words "affecting interstate commerce" Congress intended to exercise the full jurisdictional reach constitutionally permissible under the Commerce Clause. [citation omitted].

> With the statutory breadth of § 844(i) in mind, we are of the opinion that the evidence in this case demonstrated a sufficient interstate nexus. As we have noted, the back hoe had been manufactured in Iowa and owned by two companies in Virginia prior to its shipment into North Carolina. It had been financed and insured by companies doing business in states other than North Carolina, and was being held for sale to "anybody, anywhere" and advertised to that effect in a periodical published in the State of Tennessee. Accordingly, we hold that the district court properly exercised jurisdic-

tion and the convictions are affirmed. *United States v. Grossman,* 608 F.2d at 537.

*Sweet, Schwanke,* and *Grossman* are cited by the government as support for two broad propositions: (1) that the terms of § 844(i) were intended by Congress to exercise "the full jurisdictional reach constitutionally permissible under the Commerce Clause"; and (2) that the full jurisdictional reach of the commerce clause (and so of § 844(i)) extends to anything having "a *de minimis* effect on commerce". Such broad language does appear in *Sweet, Schwanke,* and *Grossman.* Its meaning becomes clear, however, only in the context of the facts and reasoning appearing in those cases.

The *Sweet* court three times cited *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), a leading Commerce Clause case which was relied on in *United States v. Keen,* 508 F.2d 986 (CA9 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975) and "which to some extent the Government relies on here." *United States v. Sweet, supra,* 548 F.2d at 200. *Perez* was a loan-sharking prosecution under 18 U.S.C. § 891, in which defendants challenged the extent of Congress's regulatory power under the commerce clause. The Supreme Court began its analysis by drawing a three part distinction:

> The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods (18. U.S.C. §§ 2312–2315) or of persons who have been kidnapped (18 U.S.C. § 1201). Second, protection of the instrumentalities of interstate commerce, as for example, the destruction of an aircraft (18 U.S.C.'§ 32), or persons or things in commerce, as, for example, thefts from interstate shipments (18 U.S.C. § 659S). Third, those activities affecting commerce. It is with this last category that we are here concerned. *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971).

*Perez* indicates that criminal statutes based on commerce clause jurisdiction fall into three categories: (1) statutes regulating channels of commerce; (2) statutes regulating things or persons in commerce; and (3) statutes regulating activities affecting interstate commerce.

Within any category, a statute might be narrowly drawn, to exercise part of Congress's commerce clause power, or broadly drawn to exercise "the full jurisdictional reach" of Congress's commerce clause power over a particular category. However, no statute within any one category could properly be said to exercise "the full jurisdictional reach constitutionally permissible under the Commerce Clause". This could be done only by a statute encompassing all three categories, and manifesting an intention to use the "full jurisdictional reach" of the Commerce Clause as to each category.

Section 844(i) is not drawn so broadly. It penalizes anyone who:

> maliciously damages or destroys, or attempts to destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce * * *.

In no way does § 844(i) attempt to regulate channels of interstate commerce; it is not a category one statute. The section does mention both "property" (category 2) and "activity affecting interstate commerce" (category 3). However, the phrase "activity affecting interstate commerce" is only used as part of a larger adjective clause ("used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce") which modifies the preceding noun clause ("any building, vehicle, or other real or personal property.") Thus, § 844(i) does not apply to "activity affecting interstate commerce" (category 3). It applies only to destruction of interstate property (category 2), with interstate property broadly defined to include property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." In short, § 844(i) is a

category 2 statute regulating property in commerce, not a category 3 statute regulating activity affecting commerce.

The government correctly states that § 844(i) is broadly drawn, and that its broad terms indicate an intent to exercise the full reach of Congress's commerce clause jurisdiction over property in commerce. However, it is inaccurate to suggest, as does the government in its first proposition, that § 844(i) intends to exercise "the full jurisdictional reach constitutionally permissible under the Commerce Clause". As noted above, the statute does not attempt to regulate either channels of interstate commerce (category 1) or activities affecting interstate commerce (category 3), and thus falls far short of exercising the full extent of Congress's commerce clause power. Congress had the constitutional authority to enact a statute encompassing all three categories, but by enacting § 844(i), Congress regulated only category 2 problems.

■ The government is also correct in stating that Congress's commerce clause power extends to anything having a *de minimis* effect on commerce. However, it is again inaccurate to suggest, as does the government in its second proposition, that § 844(i) intends to regulate all use of explosives having "a *de minimis* effect on commerce". Section 844(i), as a category 2 statute, exercises only the full extent of Congress's commerce clause jurisdiction over property, by extending to all *property* having a *de minimis* connection with interstate commerce.

■ In short, analysis must begin by recognizing that, under *Perez*, § 844(i) is a category 2 statute, regulating "persons or things in commerce". Only then can the holdings of *Sweet, Schwanke*, and *Grossman* be properly set forth as establishing that: (1) § 844(i) exercises the full jurisdictional reach constitutionally permissible under the commerce clause over interstate *property*; and (2) § 844(i) extends to any *property* having a *de minimis* connection with interstate commerce.

## DISCUSSION

■ Turning to the facts in this case, this court finds that the connection between the destroyed properties and interstate commerce is insufficient to support commerce clause jurisdiction under this category 2 statute.

Both 10 Yacht Street and 26 Sally Lane were private homes,[7] not business properties such as the tavern in *Sweet*, the building in *Schwanke*, or the back hoe in *Grossman*.[8] The claimed connections between the private residences involved in this case and interstate commerce were that the homes were built with interstate materials, financed by interstate banks, and insured by interstate insurance companies. The government does not contend that these private residences had any other unusual interstate connections, or that the con-

---

7. As noted in the statement of facts, the government alleges that the premises at 26 Sally Lane were offered for rent to the public. From this, the government argues that "the Sally Lane property was used as a business property * * *." Government's brief at 14. However, it is undisputed that no business, interstate or intrastate, was conducted on the premises at 26 Sally Lane, which served only as a private residence. The fact that a private residence is offered for sale or lease does not in itself make the residence a "business property". Even less does it transform the residence into property "used in interstate commerce or in any activity affecting interstate commerce". The court concludes that the lease or sale of this private residence did not alter its jurisdictional status under § 844(i).

8. The government states that "in *Grossman* the property in question was not being used in a business * * *." Government's brief at 14. It is true that in *Grossman* the owner of the back hoe at the time of the explosion "did not use the back hoe in his business, he held it for sale to 'anybody, anywhere' * * *." *United States v. Grossman, supra*, 608 F.2d at 535. However, since its manufacture in 1971, the back hoe had travelled from Iowa, to Virginia, to North Carolina. The North Carolina owner at the time of the explosion was advertising it for sale in a Tennessee trade publication. Furthermore, the back hoe was a piece of large machinery used solely for business purposes. Thus, the interstate connections of the property in *Grossman* were quantitatively and qualitatively different from the interstate connections of the property involved in this case.

structing, financing, and insuring of these homes was peculiarly interstate.[9] Rather, the government asks this court to recognize:

> The fact that, in this day and age, even a residential dwelling can have a sufficient impact on interstate commerce to invoke federal jurisdiction under the Commerce Clause. * * * [T]here is a rapidly expanding body of case law which suggests that virtually any building has sufficient contact with interstate commerce to invoke federal jurisdiction. Government's brief at 11–12.

The "rapidly expanding body of case law" turns out to be the § 844(i) cases discussed above, *Sweet, Schwanke,* and *Grossman,*[10] plus two other § 844(i) cases, *United States v. Nashawaty,* 571 F.2d 71 (CA1 1977) and *United States v. Corbo,* 555 F.2d 1279 (CA5 1977), both of which were prosecutions for destruction of business properties: a paint store in *Nashawaty,* a book store in *Corbo.*[11]

None of these cases supports the government's novel contention that "virtually any building has sufficient contact with interstate commerce to invoke federal jurisdiction". Each dealt with business property; none suggested that private residences were sufficiently connected with interstate commerce to support commerce clause jurisdiction. If accepted, the government's novel contention would in theory justify a tremendous expansion of commerce clause jurisdiction in category 2 cases. It would allow Congress to regulate practically all matters connected with "virtually any building" in America.[12] Although admittedly the courts have steadily expanded commerce clause jurisdiction in category 2 cases over the past 50 years, no court has yet gone this far.

The government attempts to supplement the properties' infinitesimal interstate contacts by focusing on the effect of defendants' *activities* on interstate commerce:

> [T]he legislative history makes it apparent that, as in the case of loan-sharking, bombings and the use of explosives have become a nationwide epidemic having a substantial impact on the economy.

> That this case falls squarely within the boundaries of the evil which Congress sought to eradicate is underscored by the motive behind each of the arsons in question here. In each case, the motive for destroying the building was to fraudulently procure insurance proceeds from an out-of-state insurance company by means of false pretenses. Because this was the motive, the fact that the insurance companies paid the proceeds through out-of-

---

**9.** At the February 13, 1980 conference, the following exchange occurred between the court and the Assistant United States Attorney:

> THE COURT: Is there something special about the use of these buildings that is going to come out at trial?
> ASS'T U. S. ATTORNEY: Something special?
> No. We are at this point attempting to find out where the wood came from, where the gas came from, where the food came from, things of that nature which will meet the requirements of these other cases.

**10.** The government also cites *United States v. Keen,* 508 F.2d 986 (CA9 1974), *cert. denied* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975). *Keen* upheld § 844(i) jurisdiction over the destruction of a commercial fishing boat, but without analyzing the statute. The government also cites the trial court's charge in *United States v. Barton,* a case now on appeal to the Second Circuit from the Western District of New York. This citation is unhelpful, since *Barton* is unreported, and the government

failed to supply the court with either a copy of the charge or sufficient information about the case to permit intelligent evaluation.

**11.** It is of interest that the defendants in *Corbo* were indicted under § 844(i) for the destruction of a book store, but apparently were not indicted for an attempted firebombing of a private residence which took place several days earlier. *United States v. Corbo,* 555 F.2d at 1281.

**12.** At the February 13, 1980 conference, the following exchange occurred:

> THE COURT: If your premise is correct, Congress could then say that any conduct that took place in a building affecting interstate commerce, which would mean any building in the United States, was a federal crime.
> ASS'T U. S. ATTORNEY: That may be where we are left, but the question is whether they [the legislators] feel that it is. Transcript at 17

state banks is a significant one for juris-dictional purposes.*

* Moreover, it should be noted that Cruser, Natale and Angelo Cennamo (who pleaded guilty in a related matter) were torch men for an arson-for-hire ring that operated through-out Long Island over a period of several years. Their combined admissions reveal close to 100 arsons committed during that period, some occurring in other states. While the offenses charged here were the objects of separate conspiracies, they represent episodes in a continuing and pervasive pattern of criminal conduct in which Cruser, Natale, Cennamo and Mennuti were continuing participants. The motive behind each of the arsons committed was to fraudulently obtain insurance proceeds from national insurance companies. That this conduct has had a substantial impact on interstate commerce of the type contemplated by Congress is readily apparent. Government's brief at 10–11.

Insurance arson and related activities un-questionably have a substantial impact on interstate commerce, and undoubtedly could be prohibited by Congress. *A fortiori*, Congress could prohibit insurance arson rings operating across state lines. In fact, Congress could extend § 844(i), as the government urges, to prohibit anyone from damaging by explosives a building that is financed in, insured in, built with or repaired by materials purchased in interstate commerce.[13] However, such an extension is a matter for Congress not the court; it would go far beyond Congress' intent as expressed either in the language or in the legislative history of § 844(i).[14] Section 844(i) as it now stands applies only to property having certain *de minimis* interstate connections. This court holds that the interstate connections of the private residences involved in this case are insufficient to support jurisdiction over the present prosecution.

13. Indeed, it is likely that under the commerce clause Congress has broad power to regulate any building insured by an interstate insurance company, just as Congress has commerce clause power to regulate banks insured by the FDIC. *See*, e. g., 18 U.S.C. § 2113.

14. The legislative history cited in the government's brief and in *Sweet, Schwanke*, and *Grossman*, indicates that Congress is and was concerned about "bombings and the threat of bombings [which] have become an ugly, recur-

## CONCLUSION

Accordingly, defendants' motion to dismiss is granted, and the clerk shall enter judgment dismissing the indictment against defendants Natale and Mennuti.

So ordered.

rent incident of life in cities and on campuses throughout our Nation." House Report No. 91–1549, Organized Crime Control Act of 1970, 1970 U.S.Code Cong. & Admin.News at p. 4013.

Although that history lends support to the contention that § 844(i) was intended to reach "substantially all business property" in the country, [1970] U.S.Code Cong. & Admin. News, p. 4046, nothing in the history suggests that Congress intended to reach all residential structures as well.