121 F.3d 472
 97 Cal. Daily Op. Serv. 5983, 97 Daily Journal
D.A.R. 9618
Catherine Pierce BROWN, a single woman, Plaintiff-Appellant,
v.
INVESTORS MORTGAGE COMPANY; Seattle Management Company;
Stephen H. Anderson; Jane Doe Anderson; Puget Sound
Investment Group; CLS Mortgage Inc.; Thomas Harsh Inc.,
d/b/a Thomas Harsh Profit Sharing Plan, Defendants-Appellees.
 No. 96-35477.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 7, 1997.
Decided July 29, 1997.
 
 Mark S. Elgot, Seattle, WA, for Plaintiff-Appellant.
 Jonathan B. Noll and David Utevsky, Foster, Pepper & Shefelman, Seattle, WA, for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-95-01471-TSZ.
 Before: BROWNING, RYMER, and T.G. NELSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiff Catherine Brown borrowed $28,800 on her home. She fell behind in her payments. The lender initiated foreclosure proceedings.
 
 
 2
 To prevent foreclosure, Brown borrowed another $50,000 on her home from defendant CLS Mortgage, Inc. The debt carried 16% interest, required monthly payments of $666.67 for three years, and was then payable in full. The maximum interest permitted by state usury law was 12.22%. Brown again fell behind, and CLS commenced foreclosure.
 
 
 3
 To pay off the CLS loan, Brown borrowed $74,000 from defendant Investors Mortgage Company (IMC). The debt carried interest of 15%, exceeding the existing 12% limit under state law. Brown defaulted. IMC commenced nonjudicial foreclosure. Brown filed for bankruptcy and sued the lenders and others to invalidate the loans, alleging violations of state usury law and the Washington Consumer Protection Act. Defendants moved for summary judgment. The bankruptcy court ordered dismissal. The district court affirmed.
 
 I.
 
 4
 The lenders argue Washington's usury statute has been preempted by the Depository Institutions Deregulation and Monetary Control Act (DIDMCA) of 1980.
 
 A.
 
 5
 Interpretation of a federal statute preempting state law begins with the text and is guided by two presumptions: such statutes are to be interpreted narrowly in light of federalism concerns; and the purpose of Congress is "the ultimate touchstone." Medtronic, Inc. v. Lohr, 518 U.S. 470, ----, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996).
 
 
 6
 Section 501(a)(1) of DIDMCA exempts mortgages or loans "secured by a first lien on residential real property" from state laws "expressly limiting the rate or amount of interest, discount points, finance charges, or other charges." 12 U.S.C. § 1735f-7a(a)(1). The statutory language plainly encompasses the loans at issue here. The words are unqualified: state usury restrictions "shall not apply to any loan, mortgage, credit sale, or advance" secured by a first lien. Id. (emphasis added).
 
 
 7
 Neither the language nor purpose of Section 501(a)(1) supports Brown's argument that the preemptive effect of the statute is limited to purchase money mortgages. See Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 911-12 (3d Cir.1990). Congress enacted DIDMCA to promote the stability and viability of financial institutions by allowing them to charge market interest on mortgage loans, and to promote home ownership by increasing the flow of available mortgage money. See id. Exempting deposit accounts from usury ceilings allowed banks to attract deposits, S.Rep. No. 96-368, at 18 (1980), reprinted in 1980 U.S.C.C.A.N. 236, 254; see 12 U.S.C. § 1735f-7a(a)(2), and exempting first mortgage loans from the same ceilings allowed lenders to collect the revenues needed to pay depositors market rates of interest. See Smith, 898 F.2d at 912. Neither purpose would be served by limiting preemption to purchase money mortgages.
 
 B.
 
 8
 Notwithstanding preemption, DIDMCA allows a State to reassert a usury limitation if:
 
 
 9
 such State adopts a law or certifies that the voters of such State have voted in favor of any provision, constitutional or otherwise, which states explicitly and by its terms that such State does not want the provisions of subsection (a)(1) of this section to apply with respect to loans, mortgages, credit sales, and advances made in such State.
 
 
 10
 12 U.S.C. § 1735f-7a(b)(2) (emphasis added).
 
 
 11
 We reject Brown's contention that the State of Washington reasserted its usury limitation in the 1981 enactment of its general usury statute setting an annual interest rate ceiling at the higher of twelve percent or four percentage points above the yield on 26-week T-bills, see Wash. Rev.Code § 19.52.020. The 1981 statute did not state "explicitly and by its terms" that Washington did not want DIDMCA to apply to loans made in Washington.
 
 II.
 
 12
 Brown argues applying DIDMCA to these intrastate loans violates the Commerce Clause as interpreted in United States v. Lopez, 514 U.S. 549, 556-61, 115 S.Ct. 1624, 1629-31, 131 L.Ed.2d 626 (1995) (holding regulation of possession of firearm in school zone violated Commerce Clause because it had "nothing to do with 'commerce' or any sort of economic enterprise" and because it contained no jurisdictional element to ensure that each firearm possession affected interstate commerce).
 
 
 13
 The intrastate loans involved in this case are substantially related to interstate commerce. In contrast to the statute in Lopez, DIDMCA regulates commercial economic activity. Also in contrast to Lopez, Congress made specific findings that modification of state usury laws was necessary for a stable national financial system. See S.Rep. No. 96-368, 1980 U.S.C.C.A.N. at 255; cf. Lopez, 514 U.S. at 561-62, 115 S.Ct. at 1631-32 (Congress not normally required to make formal findings as to substantial effect on interstate commerce, but existence of findings in history of Gun-Free School Zones Act would have helped to evaluate effect).
 
 
 14
 Brown contends intrastate loan transactions are subject to federal regulation only if independently connected to interstate commerce, citing Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). Perez held Congress could regulate extortionate credit transactions because such transactions were a primary source of revenue for organized crime, which directly affected interstate and foreign commerce. Id. at 154-57, 91 S.Ct. at 1361-62. In this case, the connection to interstate commerce is supplied by the highly interconnected nature of the nation's home financing system, detailed in Congress' findings. As the Court observed in Perez, it is the effect on interstate commerce of the class of intrastate activities that determines Congress' power to regulate, not the effect of an individual loan. Id. at 154, 91 S.Ct. at 1361.
 
 
 15
 Contrary to Brown's argument, the Commerce Clause does not require a "jurisdictional element" in the statute. Such an element is required to ensure a connection with interstate commerce on a case-by-case basis "where Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings." United States v. Pappadopoulos, 64 F.3d 522, 527 (9th Cir.1995). Here, the activity is commercial, and the connection to interstate commerce is clear.
 
 III.
 
 16
 Brown challenges application of DIDMCA to the loans in this case.
 
 A.
 
 17
 Brown argues the federal preemption defense was waived by a provision in the IMC note that "the legality, enforceability and construction of this Note shall be governed by the laws of the State of Washington."
 
 
 18
 This language does not address federal law or the relation between state and federal law. The fact that the parties chose to apply the laws of Washington, rather than the laws of another state, does not mean the parties decided that federal law should not apply.B.
 
 
 19
 Brown contends DIDMCA does not apply to the IMC loan because the loan was not "secured by a first lien on residential real property," as required by the statute, 12 U.S.C. § 1735f-7a(a)(1)(A).
 
 
 20
 Brown claims the "first lien" on her property was a fixture lien for the purchase of a furnace and water heater from Washington Natural Gas. Clearly, such a lien is not one on "residential real property." Moreover, for the purpose of DIDMCA, a "first lien" must have the same priority as a first mortgage or first deed of trust, as determined by the law of the jurisdiction where the real estate is located. 12 C.F.R. § 590.2(c). Under Washington law, upon default, a secured party whose fixture lien has priority may "remove his collateral from the real estate but ... must reimburse any encumbrancer or owner of the real estate who is not the debtor and who has not otherwise agreed for the cost of repair of any physical injury, but not for any diminution in value of the real estate caused by the absence of the goods removed or by any necessity for replacing them." Wash. Rev.Code § 62A.9-313(8). Thus, the fixture lienholder may not assert the same priority as the holder of a first mortgage or deed of trust with respect to the proceeds from the foreclosure sale of the entire property, as required by DIDMCA and the implementing regulation.[1] While Washington courts have not addressed the issue, other jurisdictions have reached the same conclusion regarding analogous provisions.[2]
 
 C.
 
 21
 DIDMCA applies only to creditors who make or invest in residential real estate loans aggregating more than $1,000,000 per year. 12 U.S.C. § 1735f-5(b)(2)(D). Brown argues summary judgment was inappropriate because the lenders' declarations regarding the aggregate totals of their loans were conclusory and lacked supporting documentation regarding individual loans.
 
 
 22
 The lenders' declarations were sufficient to establish the aggregate value of their loans for purposes of summary judgment. The declarations were based on personal knowledge, set forth facts that would be admissible in evidence, and showed affirmatively the affiants would be competent to testify to the matters therein. See Fed.R.Civ.P. 56(e). Testimony by the lenders that the loans totaled $1,000,000 would be admissible in court and, if not countered by opposing evidence, would be sufficient to establish that conclusion in a trial.
 
 D.
 
 23
 Brown argues additional charges for late payment under the IMC note fall outside the scope of preemption.
 
 
 24
 Assuming DIDMCA preemption does not apply to late charges, Brown has not demonstrated the late charges were usurious in this case. Under Washington law, late charge provisions stipulating an interest rate higher than that allowed by usury laws "do[ ] not render the transaction usurious[,] provided the parties acted in good faith and did not intend to evade the usury law." Metro Hauling, Inc. v. Daffern, 44 Wash.App. 719, 723 P.2d 32, 33 (1986). The rationale of the rule is that a debtor may avoid the additional charge by prompt payment. Id. In Metro Hauling, a late charge was held usurious because the parties modified the contract to provide for the charge after the debtor had already defaulted and therefore could not avoid the additional charge by prompt payment. Id. at 33-34. In this case, the penalty was provided for in the original contract, and it was within Brown's power to avoid it by prompt payment. Brown alleged no facts to support a finding of bad faith.
 
 IV.
 
 25
 Brown argues the CLS and IMC notes are per se violations of Washington's Consumer Protection Act, Wash. Rev.Code § 19.86, pointing out that under the Act, entering into a usurious contract is an unfair practice per se. See Wash. Rev.Code § 19.52.036; Cuevas v. Montoya, 48 Wash.App. 871, 740 P.2d 858, 862 (1987). However, since we conclude Washington's usury law is preempted with respect to the loans at issue, the loans are not usurious and do not establish per se violations of the Consumer Protection Act.
 
 V.
 
 26
 Finally, Brown asserts the IMC loan is both procedurally and substantively unconscionable.
 
 
 27
 Brown argues the IMC loan was procedurally unconscionable because (1) Brown had no meaningful choice regarding the terms of the loan, and (2) IMC raised Brown's proposed monthly payments after she complained the proposed payments were too high. While Brown was in difficult straits, the facts she alleges in support of her first arguments do not rise to the level of unfairness required to sustain a claim of unconscionability. We reject Brown's second argument because IMC raised Brown's subsequent payments after lowering the initial payments at her request.
 
 
 28
 Brown argues the loan was substantively unconscionable. The cases cited by Brown are unpersuasive. The interest rate on the IMC loan, while high, was not unusual for loans made to high-risk borrowers.
 
 
 29
 AFFIRMED.
 
 
 
 [1]
 The fact that a perfected security interest in fixtures can take priority over a prior security interest in the real estate if the interest in fixtures is perfected by a fixture filing before or shortly after the goods become fixtures, Wash. Rev.Code § 62A.9-313(4)(a), is a further indication that the priority is limited to the fixture and does not apply to the real property to which the fixture is attached
 
 
 [2]
 See, e.g., Maplewood Bank & Trust v. Sears, Roebuck & Co., 265 N.J.Super. 25, 625 A.2d 537, 539 (1993) (secured party with priority based on perfected fixture filing gained priority only as to goods or chattels which became fixtures, not as to remainder of real property; no right to proceeds of foreclosure sale), aff'd, 135 N.J. 97, 638 A.2d 140 (1994); In re Walker, 173 B.R. 512, 515 (Bankr.M.D.N.C.1994) (security interest associated with fixture filing created no rights in real property; such rights must be created by separate deed of trust)