# Congressional Authority to Adopt Legislation Establishing a National Lottery

Neither the Taxing Clause, Article I, § 8, cl. 1, nor the Necessary and Proper Clause, Article I, § 8, cl. 18, of the Constitution authorizes Congress to establish a national lottery.

April 4, 1986

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL,
CRIMINAL DIVISION

This Office has been asked to comment on H.R. 772, 99th Cong., 1st Sess., the "National Social Security Lottery Act," and H.R. 1878, 99th Cong., 1st Sess., the "National Lottery Act." These bills, which are identical in all pertinent respects, would establish a national lottery to raise money for the federal government. After examining the constitutional authority for these bills, we have concluded that Congress lacks the power to establish a national lottery and, thus, to override the anti-gambling laws of the states.[1]

Both bills would create a National Lottery Commission, which would "establish, operate, and administer" the lottery program. H.R. 772, § 102(a); H.R. 1878, § 2(a).[2] The Commission would determine the type of lottery to be conducted, the price to be charged for tickets, the manner of selecting the winners, and the amounts of the prizes. H.R. 772, § 102(a); H.R. 1878, § 2(b). Neither bill, however, would give the Commission discretion in deciding how to use lottery revenues. Under § 201 of H.R. 772, those revenues remaining after payment of operating expenses would be deposited in the Federal Old Age

---

[1] In an earlier memorandum, this Office addressed the constitutionality of the provisions that would preempt any state or local laws prohibiting the operation of a national lottery, and concluded that the Tenth Amendment does not preclude the preemption provisions of the proposed bills. Memorandum from Ralph W. Tarr, Acting Assistant Attorney General, Office of Legal Counsel to Stephen S. Trott, Assistant Attorney General, Criminal Division (Nov. 14, 1985). Our analysis was premised, however, on the *assumption* that Congress has constitutional authority in the first instance to establish a national lottery. This memorandum examines the validity of that assumption.

[2] Under § 101(a) of H.R. 772, the Commission would consist of five members, each selected for a term of five years. The members would be chosen from among individuals who are "not elected or appointed officers or employees in the executive, legislative, or judicial branch of the Government of the United States." *Id.*

Under H.R. 1872, the five Commission members would serve for terms of six years. *Id.* § 3(c). The Secretary of the Treasury and the Secretary of Health and Human Services would serve on the Commission. *Id.* § 3(a). The remaining three members of the Commission would be chosen from among individuals who are "directors of lotteries operated by States or have experience which would provide expertise with respect to the operation of a legitimate lottery which is reasonably equivalent to that of such a director." *Id.* § 3(b).

Both bills provide that members of the Commission may be removed by the President "upon notice and hearing, for neglect of duty or malfeasance in office but for no other cause." H.R. 772, § 101(a)(2); H.R. 1878, § 3(c).

40

and Survivors Insurance Trust Fund, the Federal Disability Insurance Trust Fund, and the Federal Hospital Insurance Trust Fund.[3] Under §§ 7 and 8 of H.R. 1878, remaining revenues would be divided as follows: (1) 50 percent to be deposited in the Federal Hospital Insurance Trust Fund; and (2) 50 percent to be deposited in the general fund of the Treasury for the purpose of reducing the federal deficit. Both bills provide for the sale of national lottery tickets nationwide, notwithstanding any state law prohibiting lotteries. H.R. 772, § 104(a); H.R. 1878, § 6(a)(1).[4] The preemption provisions do not, however, invalidate any state or local lotteries. H.R. 772, § 104(b); H.R. 1878, § 6(a)(2).

In considering the constitutionality of H.R. 772 and H.R. 1878, we begin by noting that Article I, § 8 of the Constitution does not endow Congress with "all legislative power." The delegates to the Constitutional Convention considered such a broad description of congressional authority, but decided instead that Congress' powers should be specifically enumerated.[5] An act of Congress therefore is invalid unless it is affirmatively authorized under the Constitution. The Tenth Amendment makes explicit the doctrine of enumerated powers, stating: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

Under the doctrine of enumerated powers, H.R. 772 and H.R. 1878 are invalid unless the creation of a national lottery falls within one of the limited grants of legislative authority conferred upon Congress.[6] The, Constitution, of

---

[3] Under § 201(d)(3), the Secretary of Treasury, after consulting with the Secretary of Health and Human Services, would determine how to allocate lottery revenues among these three trust funds.

[4] The bills provide:

The Commission shall continuously consult and cooperate with appropriate State and local governmental authorities, particularly those in States and localities having laws or specific public policies relating to lotteries, with the objective of facilitating the operation of the national lottery under this Act and . . . minimizing the impact of the national lottery on State and local activities, laws, and policies bearing directly or indirectly upon the conduct of lotteries in general or of the national lottery under this Act in particular.

H.R. 772, § 104(c); H.R. 1878, § 6(b).

[5] The delegates at the Convention voted twice for a simple description such as that embodied in the Virginia Plan: "[T]he National Legislature ought to be empowered to enjoy the Legislative Rights vested in Congress by the Confederation, and moreover to legislate in all cases to which the separate states are incompetent, or which the harmony of the United States may be interrupted by the exercise of individual Legislation." *See* 1 M. Farrand, *Records of the Federal Convention of 1787* 53 (1911).

[6] *See National Prohibition Cases*, 253 U.S 350, 377 (1920) ("Congress is always exercising delegated, limited, circumscribed and enumerated powers, and not the broad and elastic police powers of a State."); *House* v. *Mayes*, 219 U.S. 270, 281 (1911) ("Government created by the Federal Constitution is one of enumerated powers, and cannot, by any of its agencies, exercise an authority not granted by that instrument."); *Kansas* v. *Colorado*, 206 U.S. 46, 81 (1907) ("By reason of the fact that there is no general grant of legislative power, it has become an accepted constitutional rule that this is a government of enumerated powers."), *United States* v. *Harris*, 106 U.S. 629, 635 636 (1882) ("The government of the United States is one of delegated, limited, and enumerated powers . . . . Therefore every valid act of Congress must find in the Constitution some warrant for its passage."); *McCulloch* v. *Maryland*, 17 U S (4 Wheat.) 316, 405 (1819) ("This government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it, . . . is now universally admitted."); *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 326 (1816) ("The government . . . of the United States can claim no powers which are not granted to it by the Constitution, and the powers actually granted must be such as are expressly given, or given by necessary implication.").

41

course, does not explicitly authorize Congress to establish a national lottery. We therefore turn to an examination of the only sources of constitutional authority that even arguably support congressional enactment of a national lottery: the Taxing Clause (Article I, § 8, cl. 1) and the Necessary and Proper Clause (Article I, § 8, cl. 18).

## I. The Taxing Clause

Under the Articles of Confederation, the national government lacked authority to lay and collect taxes. Articles of Confederation, Art. IX. Widely blamed for the failure of the Articles of Confederation, *see* L. Tribe, *American Constitutional Law* 5–2 at 225 n.2 (1978), the inability to tax was remedied in Article I of the Constitution, which grants to Congress the authority to impose taxes for governmental purposes:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States.

Art. I, § 8, cl. 1.

The Framers clearly intended for Congress' taxing authority to be very broad. In order to prevent the United States from "resigning its independence and sinking into the degraded condition of a province," *id.*, they granted to Congress "a complete power . . . to procure a regular and adequate supply of revenue." *The Federalist* No. 30, at 188 (A. Hamilton) (C. Rossiter ed. 1961). The Supreme Court has interpreted Congress' taxing power in a manner consistent with this original intent. In *The License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867), for example, the Court stated that Congress' taxing power "reaches every subject." The Court also has noted that Congress' authority in this area is "exhaustive and reaches every conceivable power of taxation." *Brubasher* v. *Union Pacific R. Co.*, 240 U.S. 1, 12 (1916).

Despite the breadth of Congress' taxing power, the fact remains that the terms of Article I do not authorize Congress to fund the activities of the federal government by any means it chooses. Rather, Article I provides quite specifically that Congress may raise revenues by imposing "taxes, duties, imposts, and excises."[7] The Framers obviously were aware that these terms impose some limits on the means by which the national government may raise revenues. Alexander Hamilton, for example, recognized that Congress has the power to tax only "in the ordinary modes." *The Federalist* No. 31, at 195 (C. Rossiter ed. 1961).

---

[7] Article I, of course, also authorizes Congress "[t]o borrow money on the credit of the United States." U.S. Const. art. 1, § 8, cl. 2. Obviously, establishment of a national lottery cannot be sustained as an exercise of the Congress' power to borrow money.

Although the Framers did not discuss at length the meaning of the terms "taxes," "duties," "imposts," and "excises," it seems clear that these terms were not intended to encompass a government sponsored national lottery. The word "taxes" was used by the Framers to denote "contributions imposed by the government upon individuals." 1 J. Story, *Commentaries on the Constitution of the United States* § 950, p. 676 (4th ed. 1873).[8] A lottery, of course, involves a voluntary, rather than an imposed, contribution. A lottery also does not fit within the definition of a "duty," which likewise denotes an involuntary payment to the government.[9] Indeed, Luther Martin, a Maryland delegate to the Constitutional Convention, was informed by the Committee of Detail that the word "duties" simply meant "stamp duties on paper, parchment, and vellum." 3 M. Farrand, *Records of the Federal Convention of 1787* 203 (1911) (speech to the Maryland legislature). The power to lay and collect "imposts" similarly was intended to be narrow; Martin stated that it authorized Congress to "impose duties on any and every article of commerce imported into these States." *Id.* at 204.[10] Finally, an "excise" was "deemed to be . . . an inland imposition, paid sometime upon the consumption of the commodity, or frequently upon the retail sale, which is the last stage before consumption." 1 J. Story, *Commentaries on the Constitution of the United States* § 953, at 680 (4th ed. 1873); *see also Flint* v. *Stone Tracy Co.*, 220 U.S. 107, 151 (1911) (excises are "taxes laid upon the manufacture, sale or consumption of commodities within the country, upon licenses to pursue certain occupations, and upon corporate privileges").

Thus, the Framers' usage of the terms "taxes, duties, imports, and excises" in Article 1, § 8, cl. 1 accords with the contemporary usage of those terms, and plainly reflects that a lottery does not fall within the scope of any of the modes of revenue raising enumerated in the Taxing Clause. This conclusion is reinforced by the fact that lotteries were an important source of governmental revenues at the time the Constitution was drafted. During the Colonial period, the colonies sanctioned 158 lotteries. *See* J. Ezell, *supra* note 8, at 54. The funds raised were used to finance bridges,[11] roads,[12] schools,[13] lighthouses,[14]

---

[8] In 1826, Thomas Jefferson noted that the State of Virginia often has used lotteries to raise money for "useful under-taking[s]," such as schools. 17 *The Writings of Thomas Jefferson* 450 (A. Lipscomb ed. 1904). He stated that money raised in this way was a "tax . . . laid on the willing only, that is to say, on those who can risk the price of a ticket." *Id.* Jefferson apparently was using the word "tax" in a colloquial sense. In any event, he clearly was not expounding on the meaning of the term as it is used in Article I, § 8, cl. 1 of the Constitution.

It is noteworthy that Jefferson's aforementioned reference to lotteries came in a letter strongly defending state authorized lotteries. At the time, he was seeking legislative approval of a private lottery to dispose of his own land. The eighty-three-year old Jefferson was over $80,000 in debt and believed that a lottery was the only way in which he could get a fair price for his acreage. J. Ezell, *Fortune's Merry Wheel* 168 (1960). Only sixteen years earlier, in 1810, Jefferson had condemned lotteries and stated that he had "made it a rule never to engage in a lottery or any other adventure of mere chance." 12 *The Writings of Thomas Jefferson* 386 (A. Lipscomb ed. 1904) (letter to Trustees for the Lottery of East Tennessee College).

[9] *See Webster's Third New International Dictionary* 705 (1976).

[10] According to Justice Story, the Framers probably intended the term "impost" to mean a "duty on imported goods and merchandise." 1 J. Story, *Commentaries on the Constitution of the United States* § 952, at 678–79 (4th ed. 1873).

[11] In 1760, New Hampshire authorized a lottery to raise 4000 pounds to build a bridge over the Exeter

Continued

43

churches,[15] and the war against the French.[16] The lotteries did not cease when the Declaration of Independence was signed; during the first 13 years of our Nation's independence, the states authorized about 100 lotteries. Prior to 1781, many of these state-sanctioned lotteries financed the war for independence against the British.[17] After General Washington's victory at Yorktown, these lotteries were used to raise funds for internal improvements within the states. The use of lotteries during this period was not confined to the state governments. In 1776, the Continental Congress established a United States lottery to raise $1,005,000 for troops in the field.[18]

The prevalence of lotteries during the Colonial and Confederation periods strongly suggests that the Framers' failure to endow Congress with the authority to establish lotteries was not inadvertent. Instead, this history suggests that the Framers wanted to allow each individual state to decide what lotteries, if any, would be permitted within its borders. By failing to grant Congress the authority to establish lotteries, we believe that the Framers intended that the power to raise revenues by lotteries would be "reserved to the States." U.S. Const. amend. X.

There are two primary reasons that the Framers might have wanted to reserve to the states alone the power to authorize lotteries. First, the Framers may have concluded that a national lottery, by competing with state lotteries, would impede the states' ability to raise revenues by this method. The cost of raising a dollar by lottery is far higher than the cost of raising a dollar by taxation,[19] and state lotteries would become even more inefficient as a means of raising revenue if they were forced to compete with a national lottery. Given the importance of lotteries as a source of governmental funding in 1787, the Framers may have wanted to accord the states the exclusive ability to raise revenues by this method. H.R. 772 and H.R. 1878, by establishing a national

---

[11] (. . . continued)

River. J. Ezell, *supra* note 8, at 56. Eight years later, a second lottery was licensed to raise 1000 more pounds to complete the bridge. *Id.*

[12] In 1762, Rhode Island sanctioned a lottery to raise 4000 pounds to repair the road between Providence and Connecticut. J. Ezell, *supra* note 8, at 58.

[13] In 1746, New York authorized a lottery to raise 2,250 pounds for the founding of King's College (later Columbia). J. Ezell, *supra* note 8, at 56. Four subsequent lotteries were sanctioned to raise money for King's College in 1748, 1753 (two), and 1754. *Id.*

[14] In 1760, Connecticut authorized a lottery to raise 500 pounds for the building of a lighthouse at New London. J. Ezell, *supra* note 8, at 55.

[15] In 1769, Pennsylvania authorized a lottery to raise 3099 pounds and 12 shillings for the First, Second, and Third Presbyterian churches in Philadelphia and the German Reformed church at Wooster. J. Ezell, *supra* note 8, at 57.

[16] In 1754, Virginia authorized a lottery to raise 6000 pounds for protection against the French. J. Ezell, *supra* note 8, at 59.

[17] Massachusetts, for example, authorized a lottery to raise $750,000 to reward enlistees in the Continental Army. J. Ezell, *supra* note 8, at 71.

[18] Although initially very popular, this national lottery ultimately was unsuccessful. *See* J. Ezell, *supra* note 8, at 61–63.

[19] It has been reported that "it costs states anywhere from 15 cents to 40 cents to collect one dollar in lottery revenue; the cost of producing a dollar in revenue through conventional means of taxation is less than a nickel." D. Morrison, *Tristate Area Is Gambling Again on More Gambling*, N.Y. Times, July 4, 1976, § 4, at 4.

lottery, almost certainly would diminish lottery revenues in 22 states and the District of Columbia.[20]

The controversial nature of lotteries during the period of the American founding suggests a second and possibly more important reason why the Framers chose not to grant Congress the power to establish a national lottery. Although lotteries were widely permitted in 1787, many groups objected to them on religious and moral grounds. Famous Puritan theologians such as Cotton Mather had argued,[21] as had the Quakers,[22] that the Bible prohibited lotteries. This opposition must have suggested to the Framers the possibility that states and localities might subsequently wish to abolish lotteries. Indeed, shortly after the adoption of the Constitution, this possibility became a reality, as most states adopted legislation abolishing lotteries.[23] In this historical context, and in light of the Framers' clear intent that the states retain primary authority to regulate public morality,[24] it is not surprising that the Constitutional Convention did not authorize Congress to establish a national lottery. Such a lottery presumably would be effective in every state,[25] and therefore would prevent states opposed to lotteries from eliminating this form of gambling or from regulating the national lottery in ways thought to be necessary for protection of the public welfare.

This interpretation of the Taxing Clause is bolstered by the fact that Congress has never established a national lottery pursuant to this constitutional provision. In 1812, Congress enacted a statute that permitted the District of

---

[20] Lotteries have again become a very important source of revenues in many states. In 1984, lotteries netted $2.9 billion, on total wagers of $7.1 billion, for 17 states and the District of Columbia. Since then, five other states have launched lotteries, and California's alone grossed $1 billion in the first four months. D. Farney, *More States Bet on Lotteries to Increase Revenue as Popularity of this "Painless Taxation" Grows*, Wall St. J., Feb. 7, 1986, at 42.

[21] Cotton Mather explained·
    [L]ots, being mentioned in the sacred oracles of Scripture as used only in weighty cases and as an acknowledgment of God sitting in judgment . . . cannot be made tools and parts of our common sports without, at least, such an appearance of evil as is forbidden in the word of God.
U.S. Dep't of Justice, *The Development of the Law of Gambling: 1776–1976* at 51 (1977) (quoting H. Chafetz, *Play the Devil* 14 (1960)).

[22] The Quakers, more than any other religious group, were consistent in a their opposition to lotteries. *See* J. Ezell, *supra* note 8, at 18.

[23] In 1833, the Pennsylvania legislature enacted a statute providing that "all and every lottery and lotteries, and device and devices in the nature of lotteries, shall be utterly and entirely abolished, and are hereby declared to be thenceforth unauthorized and unlawful." 1832–1833 Laws of Pennsylvania, Act No. 32, § 1. By 1860, every state except three had followed suit. J. Ezell, *supra* note 8, at 228–29.

[24] *See, e.g.*, *The Federalist* No. 45, at 292–93 (J. Madison) (C. Rossiter ed. 1961) ("The powers reserved to the several States will extend to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people."); *House* v. *Mayes*, 219 U.S. 270, 282 (1911) ("that among the powers of the State, not surrendered — which power therefore remains with the State — is the power to so regulate the relative rights and duties of all within its jurisdiction so as to guard the public morals"); *Barbier* v. *Connolly*, 113 U.S. 27, 31 (1885) (A state exercises its police power "to prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity."); *Roth* v. *United States*, 354 U.S. 476, 504 (1956) (Harlan, J., concurring and dissenting) ("States . . bear direct responsibility for the protection of the local moral fabric.").

[25] H.R. 772 and H.R. 1878 both provide that the national lottery would be effective even in those states that prohibit all lotteries. *See* H.R. 772, § 104(a); H.R. 1878, § 6(a)(1).

Columbia to authorize lotteries.[26] But this statute did not allow the sale of lottery tickets outside of the District. *Cohens* v. *Virginia*, 19 U.S. (6 Wheat.) 264, 447 (1821). Instead, this lottery was enacted pursuant to Article I, § 8, cl. 17 of the Constitution,[27] which empowers Congress to govern the District of Columbia. 19 U.S. (6 Wheat.) at 424. Thus, the 1812 statute, and a virtually identical provision enacted in 1820,[28] simply permitted the District of Columbia to raise revenues by the same means employed by the states. A "national" lottery was not created.[29]

## III. The Necessary and Proper Clause

Article I, § 8, cl. 18 of the Constitution provides that Congress may enact those laws that are "necessary and proper for carrying into Execution" its enumerated powers. In the early years of the Republic, this constitutional provision was the source of heated debate. Jefferson believed that the Necessary and Proper Clause, if interpreted broadly, would "swallow up all the delegated powers, and reduce the whole to one power." G. Gunther, *Constitutional Law* 96 (10th ed. 1980). Hamilton, on the other hand, argued that "[t]he only question must be . . . whether the means to be employed . . . has a natural relation to any of the acknowledged objects or lawful ends of the government." *Id.* The views of Hamilton ultimately prevailed in *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316 (1819), in which the Supreme Court upheld the power of Congress to charter a second Bank of the United States. The Court refused to interpret the Constitution in a manner that would confine "the choice of means

---

[26] *See* Act of May 4, 1812, ch. 75, § 6, 2 Stat. 726:

That the said corporation shall have full power and authority . . . to authorize the drawing of lotteries for effecting any important improvement to the city, which the ordinary funds or revenue thereof will not accomplish; *Provided,* That the amount to be raised in each year shall not exceed the sum of ten thousand dollars: *And provided also,* That the object for which the money is intended to be raised shall be first submitted to the President of the United States, and shall be approved by him.

[27] Article I, § 8, cl. 17 of the Constitution provides that Congress shall

exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States.

This clause gives Congress "the combined powers of a general and of a State government in all cases where legislation is possible." *O'Donoghue* v. *United States*, 289 U.S. 516, 539 (1933) (quoting *Stoutenburgh* v *Hennick*, 129 U.S. 141, 147 (1889)).

[28] The District of Columbia's New Act of Incorporation provided in pertinent part:

That the said corporation shall have full power and authority . . . to authorise with the approbation of the President of the United States, the drawing of lotteries for the erection of bridges and effecting any important improvements in the city which the ordinary revenue thereof will not accomplish, for the term of ten years: *Provided,* That the amount so authorised to be raised in each year shall not exceed the sum of ten thousand dollars, clear of expenses.

Act of May 15, 1820, ch. 104, § 8, 3 Stat. 588.

[29] At least thirteen lotteries were authorized by the District of Columbia and approved by the President. The first lottery, which was approved by President Madison on November 23, 1812, was designed to raise money for the establishment of two public schools in the City of Washington. *Laws of the Corporation of Washington* 110 (Burch 1823). The second lottery was to raise funds for a local penitentiary; the third, a city hall *Id.* at 110–11 The ten subsequent lotteries were established to produce revenues for the same three government projects. *Id.* at 111–12; *Laws of the Corporation of Washington* 278–79, 283 (Rothwell 1833).

46

to [the] narrow limits" proposed by Jefferson. *Id.* at 413. Chief Justice Marshall wrote:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.

*Id.* at 420. *See also Perez* v. *United States*, 402 U.S. 146, 151 (1971); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241, 258 (1964); *Wickard* v. *Filburn*, 317 U.S. 111, 124 (1942). *Cf. Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 564–65 (1985) (Powell, J., dissenting).

The language used by Chief Justice Marshall in *McCulloch* clearly shows that the Necessary and Proper Clause does not remove all limitations on Congressional power. The means chosen to attain a legitimate governmental end must be consistent with the "letter and spirit of the Constitution." In recent years, the Supreme Court has reemphasized that the Necessary and Proper Clause cannot be used to circumvent other constitutional prohibitions, either explicit or implicit. In *Buckley* v. *Valeo*, 424 U.S. 1 (1976), the Court held that even though the creation of the Federal Election Commission was a legitimate end, Congress could not encroach on the Executive's authority to appoint "officers of the United States." In rejecting a claim that the legislation could be justified under the Necessary and Proper Clause, the Court stated:

> [T]he claim that Congress may provide for this manner of appointment under the Necessary and Proper Clause of Article I stands on no better footing than the claim that it may provide for such manner of appointment because of its substantive authority to regulate federal elections. Congress could not, merely because it concluded that such a measure was "necessary and proper" to the discharge of its substantive legislative authority, pass a bill of attainder or ex post facto law contrary to the prohibitions contained in section 9 of Article I. No more may it vest in itself, or in its officers, the authority to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so.

424 U.S. at 135.

Here, there can be no doubt that the raising of revenue for governmental programs is a "legitimate end." Nevertheless, like the legislation considered in *Buckley*, H.R. 772 and H.R. 1878 use means that are inconsistent with "the letter and spirit of the Constitution." As previously discussed, the Framers omitted lotteries from the list of powers in the Taxing Clause, and thus reserved this method of raising revenue exclusively to the states. U.S. Const. amend. X. Thus, here, as in *Buckley*, the allocation of governmental authority underlying the Taxing Clause cannot be circumvented by invoking the Necessary and Proper Clause.

## Conclusion

For the foregoing reasons, it is the opinion of this Office that Congress lacks authority under the Constitution to establish a national lottery. We accordingly believe that both H.R. 772 and H.R. 1878 are unconstitutional.[30]

CHARLES J. COOPER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[30] In addition to the overriding constitutional defect discussed in the text of this memorandum, these bills include an unconstitutional limitation on the President's removal power. In *Myers* v. *United States*, 272 U.S. 52 (1926), the Supreme Court held that Congress cannot limit the President's power to remove officers of the United States who are appointed by him with the consent of the Senate. To be sure, *Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935) and *Wiener* v. *United States*, 357 U.S. 349 (1958), hold that Congress can limit the President's power to remove officers who perform quasi-legislative, quasi-judicial, or adjudicatory functions. The commissioners provided for in these bills, however, would not perform such functions. The commissioners would have the power to issue regulations, a power that is plainly executive in nature and, indeed, is possessed by the heads of most executive agencies. In the words of Chief Justice Marshall, the commissioners would merely "fill up the details." *Wayman* v. *Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). It is therefore our view that those provisions would unconstitutionally restrict the President's removal power.