Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 12, 2002          Decided April 1, 2003

No. 01-5373

RANCHO VIEJO, LLC,
APPELLANT

v.

GALE A. NORTON, SECRETARY OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 00cv02798)

*John C. Eastman* argued the cause for appellant. With him on the briefs were *Hugh Hewitt, Steven B. Imhoof, John W. Wilmer, Jr.*, and *Gregory D. Russell*.

*M. Reed Hopper* and *Anne M. Hayes* were on the brief for *amicus curiae* Pacific Legal Foundation in support of reversal.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Katherine J. Barton*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Ellen J. Durkee* and *Seth M. Barsky*, Attorneys. *David C. Shilton*, Attorney, entered an appearance.

Before: GINSBURG, *Chief Judge*, and EDWARDS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

Concurring opinion filed by *Chief Judge* GINSBURG.

GARLAND, *Circuit Judge*: Rancho Viejo is a real estate development company that wishes to construct a 202-acre housing development in San Diego County, California. The United States Fish and Wildlife Service determined that Rancho Viejo's construction plan was likely to jeopardize the continued existence of the arroyo southwestern toad, which the Secretary of the Interior has listed as an endangered species since 1994. Rather than accept an alternative plan proposed by the Service, Rancho Viejo filed suit challenging the application of the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, to its project as an unconstitutional exercise of federal authority under the Commerce Clause. The district court dismissed the suit. We conclude that this case is governed by our prior decision in *National Association of Home Builders v. Babbitt*, 130 F.3d 1041 (D.C. Cir. 1997), and therefore affirm.

I

The Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Finding that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation," 16 U.S.C. § 1531(a)(1), Congress passed the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," *id.* § 1531(b).

The ESA directs the Secretary of the Interior to list fish, wildlife, or plant species that she determines are endangered or threatened. 16 U.S.C. § 1533(a). Section 9 of the Act makes it unlawful to "take" any such listed species without a permit. *Id.* § 1538(a)(1)(B). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The Secretary has promulgated, and the Supreme Court has upheld, a regulation that defines "harm" as including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding." 50 C.F.R. § 17.3; *see Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 708 (1995) (sustaining 50 C.F.R. § 17.3 as a reasonable interpretation of 16 U.S.C. § 1532(19)).

Section 7 of the ESA requires all federal agencies to ensure that none of their activities, including the granting of licenses and permits, will "jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." *Id.* § 1536(a)(2). When an agency concludes that its activities may adversely affect a listed species, it must engage in a formal consultation with the Interior Department's Fish and Wildlife Service (FWS). 50 C.F.R. § 402.14; *see* 16 U.S.C. § 1536(a)(2). Where applicable, such consultations result in the issuance of a Biological Opinion that includes a "jeopardy" or "no jeopardy" determination. 50 C.F.R. § 402.14(h)(3); *see* 16 U.S.C. § 1536(b)(4). If the FWS decides that the proposed action is likely to "jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," the opinion must set forth "reasonable and prudent alternatives," if any, that will avoid such consequences. 50 C.F.R. § 402.14(h)(3); *see* 16 U.S.C. § 1536(b)(3)(A).

The Secretary listed the arroyo toad as an endangered species on December 16, 1994. *See* Endangered and Threatened Wildlife and Plants; Determination of Endangered Sta-

tus for the Arroyo Southwestern Toad, 59 Fed. Reg. 64,859 (codified at 50 C.F.R. pt. 17). The toads live in scattered populations from California's Monterey County in the north to Mexico's Baja California in the south. *Id.*; Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Arroyo Toad, 66 Fed. Reg. 9414 (Feb. 7, 2001) (codified at 50 C.F.R. pt. 17). They breed in shallow, sandy, or gravelly pools along streams, and spend most of their adult lives in upland habitats. 66 Fed. Reg. at 9415. The toads range no farther than 1.2 miles from the streams where they breed, and none in the area at issue in this case travel outside the state of California. *Id.* Habitat destruction has driven the toad from approximately 76% of its former California range. *Id.* at 9414.

Plaintiff Rancho Viejo plans to build a 280-home residential development on a 202-acre site in San Diego County. The property is bordered on the south by Keys Creek, a major tributary of the San Luis Rey River, and is just east of Interstate 15. FWS, Biological/Conference Opinion on the Rancho Viejo Residential Development at 8, 26 (Aug. 24, 2000). The company's construction plan is to build homes in an upland area of approximately 52 acres, and to use an additional 77 acres of its upland property and portions of the Keys Creek streambed as a "borrow area" to provide fill for the project. Rancho Viejo wants to remove six feet or more of soil from the surface of the borrow area, amounting to approximately 750,000 cubic yards of material, and to transport that soil to the 52-acre housing site to the north. Joint Stip. ¶ 2. Surveys of Keys Creek have confirmed the presence of arroyo toads on and adjacent to the project site. *Id.* ¶ 7.

Because Rancho Viejo's plan would involve the discharge of "fill into waters of the United States, including wetlands," Biological/Conference Opinion at 8, the company was required by section 404 of the Clean Water Act, 33 U.S.C. § 1344, to obtain a permit from the U.S. Army Corps of Engineers (the "Corps"). *See id.* § 1344(a). The Corps determined that the project "may affect" the arroyo toad population in the area,

and sought a formal consultation with the FWS pursuant to ESA § 7.

In May 2000, Rancho Viejo excavated a trench and erected a fence, each running parallel to the bank of Keys Creek. Arroyo toads were observed on the upland side of the fence. Joint Stip. ¶ 8. In the FWS's view, the fence has prevented and may continue to impede movement of the toads between their upland habitat and their breeding habitat in the creek. *Id*. ¶ 9. On May 22, the FWS informed Rancho Viejo that construction of the fence "has resulted in the illegal take and will result in the future illegal take of federally endangered" arroyo toads "in violation of the Endangered Species Act." May 22, 2000 Letter at 1; Joint Stip. ¶ 10.

In August 2000, the FWS issued a Biological Opinion that determined that excavation of the 77-acre borrow area would result in the taking of arroyo toads and was "likely to jeopardize the continued existence" of the species. Biological/Conference Opinion at 35; *see* Joint Stip. ¶ 14. Pursuant to ESA § 7(b)(3)(A) and 50 C.F.R. § 402.02, the FWS proposed an alternative that would, without jeopardizing the continued existence of the toad, allow Rancho Viejo to complete its development by obtaining fill dirt from off-site sources instead of from the proposed borrow area. Joint Stip. ¶ 14; Biological/Conference Opinion at 37.

Rancho Viejo neither removed the fence nor adopted the FWS's proposed alternative. Instead, it filed a complaint in the United States District Court for the District of Columbia against the Secretary of the Interior and other federal defendants, alleging that the listing of the arroyo toad as an endangered species under the ESA, and the application of the ESA to Rancho Viejo's construction plans, exceeded the federal government's power under the Commerce Clause. *See* U.S. CONST. art. I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce ... among the several States....").

The parties filed cross motions for summary judgment. In ruling on those motions, the district court noted that this circuit had only recently sustained, against a Commerce

Clause challenge, a determination by the FWS that hospital construction in San Bernardino County, California would likely lead to the take of the Delhi Sands Flower-Loving Fly in violation of the ESA. *See National Ass'n of Home Builders v. Babbitt* ("*NAHB*"), 130 F.3d 1041 (D.C. Cir. 1997). Holding that Rancho Viejo's case was indistinguishable from *NAHB*, and finding nothing in subsequent Supreme Court opinions to cast doubt on that decision, the court granted the government's motion.[1]

## II

We review the district court's grant of summary judgment de novo, *United Seniors Ass'n v. Shalala*, 182 F.3d 965, 969 (D.C. Cir. 1999), and in so doing accord the ESA a "presumption of constitutionality," *United States v. Morrison*, 529 U.S. 598, 607 (2000). In this Part, we first discuss the *NAHB* decision, focusing particularly on the Supreme Court opinion that provided that case's analytic framework, *United States v. Lopez*, 514 U.S. 549 (1995). We then consider the application of *NAHB* and *Lopez* to the complaint filed by Rancho Viejo. In Part III, we examine Rancho Viejo's argument that Supreme Court opinions issued after this court decided *NAHB* have deprived that decision of its precedential force.

## A

In *Lopez*, the Supreme Court considered whether a provision of the Gun-Free School Zones Act, 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V), which made it a federal offense to possess a firearm near a school, exceeded Con-

---

[1] In the district court, the government contended that the case was not ripe for review. The court rejected that contention, and we agree that plaintiff has satisfied the requirements of ripeness. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). On appeal, the government does not reassert its ripeness contention, but does argue that the suit should be dismissed because there has been no final agency action. It is clear, however, that the FWS's Biological Opinion relating to plaintiff's proposed development project constitutes final agency action. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

gress' authority under the Commerce Clause. 514 U.S. at 551. The Court held that the clause authorizes Congress to regulate "three broad categories of activity":

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce.

*Id.* at 558–59 (citations omitted). With respect to the third category, the Court discussed four factors that led it to conclude that the activities regulated by the Gun-Free School Zones Act did not substantially affect interstate commerce.

First, the Court said, "the possession of a gun in a school zone . . . has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 560–61. Second, the Court observed that the Act "has no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 562. Third, *Lopez* noted that, "[a]lthough as part of our independent evaluation of constitutionality under the Commerce Clause we of course consider legislative findings, and indeed even congressional committee findings, . . . neither the statute nor its legislative history contains express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Id.* (internal citations, quotations, and alterations omitted). Finally, the Court determined that the relationship between gun possession and interstate commerce was simply too "tenuous[ ]" to be regarded as substantial, and that if the government's arguments were accepted, the Court would be "hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* at 564.

In *NAHB*, this circuit applied *Lopez* in a case challenging the application of the ESA to a construction project in an area that contained the habitat of the Delhi Sands Flower-Loving Fly. 130 F.3d at 1043 (Wald, J.). The fly, an endangered species, is found in only two counties, both in California. *Id.* One of those counties reported to the FWS that it planned to construct a hospital and power plant on a site occupied by the fly, and to expand a highway intersection in connection with that work. *Id.* at 1044–45. The FWS informed the county that the expansion of the intersection would likely lead to a take of the fly in violation of section 9 of the ESA. *Id.* at 1045. Thereafter, the county filed suit against the Secretary of the Interior, contending that application of the ESA in those circumstances exceeded the authority of the federal government under the Commerce Clause.

A majority of the *NAHB* court held that the take provision of ESA § 9, and its application to the facts of that case, constituted a valid exercise of Congress' commerce power. 130 F.3d at 1042, 1057 (Wald, J.); *id.* at 1057 (Henderson, J., concurring). The court found that application of the ESA fell within the third *Lopez* category, concluding that the regulated activity "substantially affects" interstate commerce. In so holding, the majority agreed upon two rationales: (1) "the loss of biodiversity itself has a substantial effect on our ecosystem and likewise on interstate commerce"; and (2) "the Department's protection of the flies regulates and substantially affects commercial development activity which is plainly interstate." *Id.* at 1058 (Henderson, J., concurring); *see id.* at 1046 n.3, 1056 (Wald, J.). Examining those two rationales within the context of *Lopez*'s four factors, the *NAHB* court concluded that application of the ESA to the county's proposed construction project was constitutional. *Id.* at 1042, 1057 (Wald, J.); *id.* at 1057 (Henderson, J., concurring). Because the second *NAHB* rationale readily resolves this case, it is the focus of the balance of our discussion.[2]

[2] In focusing on the second *NAHB* rationale, we do not mean to discredit the first. Nor do we mean to discredit rationales that other circuits have relied upon in upholding endangered species

B

Secretary Norton argues, and the district court concluded, that application of the four *Lopez* factors leads to the same result here as it did in *NAHB*. We agree.

The first *Lopez* factor is whether the regulated activity has anything "to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 561; *accord Morrison*, 529 U.S. at 610. The regulated activity at issue in *NAHB* — the construction of a hospital, power plant, and supporting infrastructure — was plainly an economic enterprise. As Judge Henderson observed, "the Department's protection of the flies regulates and substantially affects commercial development activity." *NAHB*, 130 F.3d at 1058; *see id.* at 1056 (Wald, J.) ("[T]he case at hand involves a regulation of the conditions under which commercial activity takes place."). The same is true here, where the regulated activity is the construction of a 202-acre commercial housing development.

Second, the court must consider whether the statute in question contains an "express jurisdictional element." *Lopez*, 514 U.S. at 561–62; *accord Morrison*, 529 U.S. at 611–12. Section 9 of the ESA has no express jurisdictional hook that limits its application, for example, to takes "in or affecting commerce." *Lopez* did not indicate that such a hook is required, however, and its absence did not dissuade the

---

legislation. We simply have no need to consider those other rationales to dispose of the case before us. *See, e.g.*, *Gibbs v. Babbitt*, 214 F.3d 483, 497 (4th Cir. 2000) ("The protection of the red wolf on both federal and private land substantially affects interstate commerce through tourism, trade, scientific research, and other potential economic activities."); *United States v. Bramble*, 103 F.3d 1475, 1477, 1481 (9th Cir. 1996) (upholding the Bald and Golden Eagle Protection Act's prohibition on the possession of eagle feathers, *see* 16 U.S.C. § 668(a), because "[e]xtinction of the eagle would substantially affect interstate commerce by foreclosing any possibility of several types of commercial activity," including "future commerce in eagles," "future interstate travel for the purpose of . . . studying eagles," "or future commerce in beneficial products derived . . . from analysis of their genetic material").

*NAHB* court from finding application of the ESA constitutional.[3] Nor did it dissuade the Fourth Circuit from finding a similar application of the ESA constitutional in *Gibbs v. Babbitt*, 214 F.3d 483, 487 (4th Cir. 2000). Indeed, all of the circuits that have addressed the question since *Lopez* (as well as those that have considered the matter since *Morrison)* have concluded that the absence of an express jurisdictional element is not fatal to a statute's constitutionality under the Commerce Clause.[4] Rather, in a case like this, "[t]he absence of such a jurisdictional element simply means that courts must determine independently whether the statute regulates activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affect[ ] interstate commerce." *United States v. Moghadam*, 175 F.3d 1269, 1276 (11th Cir. 1999) (internal quotation marks omitted).

The third *Lopez* factor looks to whether there are "express congressional findings" or legislative history "regarding the effects upon interstate commerce" of the regulated activity. *Lopez*, 514 U.S. at 561–62. There are no such findings or history with respect to the specific rationale that we rely upon here, the effect of commercial housing construction on interstate commerce.[5] But neither findings nor legislative history

---

[3] Nor did *Morrison*, discussed below, make an express jurisdictional element necessary. *See* 529 U.S. at 612 (stating only that such an element "may establish that the enactment is in pursuance of Congress' regulation of interstate commerce").

[4] *See, e.g.*, *Norton v. Ashcroft*, 298 F.3d 547, 557 (6th Cir. 2002); *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 211 (5th Cir. 2000); *United States v. Moghadam*, 175 F.3d 1269, 1275–76 (11th Cir. 1999); *United States v. Bird*, 124 F.3d 667, 675 (5th Cir. 1997); *see also* Appellant's Reply Br. at 8 (acknowledging that "the lack of a jurisdictional element may not be dispositive").

[5] There is ESA legislative history that supports the other primary rationale relied upon in *NAHB* — the effect of the loss of biodiversity on interstate commerce. *See NAHB*, 130 F.3d at 1050 (Wald, J.). There are also express findings and legislative history indicating that Congress enacted the ESA out of concern that land development and habitat modification were leading to species ex-

is necessary.[6] As *Lopez* acknowledged, "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Id.* at 562; *accord Morrison*, 529 U.S. at 612. Rather, such evidence merely "enable[s] [the court] to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, even though no such substantial effect was visible to the naked eye." *Lopez*, 514 U.S. at 563; *accord Morrison*, 529 U.S. at 612. As we discuss in the remainder of this section, the naked eye requires no assistance here.

The fourth *Lopez* factor is whether the relationship between the regulated activity and interstate commerce is too attenuated to be regarded as substantial. *See Lopez*, 514 U.S. at 563–67; *accord Morrison*, 529 U.S. at 612. Although Rancho Viejo avers that the effect on interstate commerce of preserving endangered species is too tenuous to satisfy this test, it does not argue that the effect of commercial construction projects is similarly attenuated. Because the rationale upon which we rely focuses on the activity that the federal government seeks to regulate in this case (the construction of Rancho Viejo's housing development), and because we are required to accord congressional legislation a "presumption of constitutionality," *Morrison*, 529 U.S. at 607, plaintiff's failure to demonstrate (or even to argue) that its project and those like it are without substantial interstate effect is fatal to its cause.

This conclusion is not diminished by the fact that the arroyo toad, like the Flower-Loving Fly, does not travel outside of California, or that Rancho Viejo's development, like the San Bernardino hospital, is located wholly within the state. *See NAHB*, 130 F.3d at 1043–44 (Wald, J.) (noting that the fly has an eight-mile radius, limited to California alone). As Judge Henderson said in *NAHB*, the regulation of commercial land development, quite "apart from the charac-

tinction and had to be controlled by federal legislation. *See infra* Part III.B.

[6] *See, e.g.*, *Gibbs*, 214 F.3d at 493 n.3; *Moghadam*, 175 F.3d at 1275.

teristics or range of the specific endangered species involved, has a plain and substantial effect on interstate commerce." *Id*. at 1059. There, "the regulation relate[d] to both the proposed redesigned traffic intersection and the hospital it [was] intended to serve, each of which ha[d] an obvious connection with interstate commerce." *Id.* (Henderson, J., concurring); *accord id.* at 1048, 1056 (Wald, J.). Here, Rancho Viejo's 202-acre project, located near a major interstate highway, is likewise one that "is presumably being constructed using materials and people from outside the state and which will attract" construction workers and purchasers "from both inside and outside the state." *Id.* at 1048 (Wald, J.).[7]

This analysis is perfectly consistent with *Lopez*. In that case, the Court noted that it had "upheld a wide variety of congressional Acts regulating intrastate economic activity where we have concluded that the activity substantially affected interstate commerce." 514 U.S. at 559. Such conclusions were often based upon viewing "regulations of activities that arise out of or are connected with a commercial transaction . . . in the aggregate." *Id*. at 561.[8] To survive Commerce Clause review, all the government must establish is

---

[7] Application of the ESA to habitat degradation has a further impact on interstate commerce by removing the incentives for states "to adopt lower standards of endangered species protection in order to attract development," thereby preventing a destructive "race to the bottom." *NAHB*, 130 F.3d at 1054–56 (Wald, J.); *see infra* Part III.D.

[8] The cases cited by the Court include: *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981), which *Lopez* described as involving "the regulation of intrastate coal mining"; *Perez v. United States*, 402 U.S. 146 (1971), which addressed congressional regulation of "intrastate extortionate credit transactions"; *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964), which reviewed the application of Title II of the Civil Rights Act of 1964 to "inns and hotels catering to interstate guests"; and *Katzenbach v. McClung*, 379 U.S. 294 (1964), a case involving application of the same statute to "the regulation of . . . restaurants utilizing substantial interstate supplies." *Lopez*, 514 U.S. at 559–60.

13

that "a rational basis exist[s] for concluding that a regulated activity sufficiently affect[s] interstate commerce." *Id.* at 557. And there can be no doubt that such a relationship exists for costly commercial developments like Rancho Viejo's.[9] As Judge Henderson made clear in *NAHB*, "[i]nsofar as application of section 9(a)(1) of [the] ESA ... acts to regulate commercial development of the land inhabited by the endangered species, 'it may ... be reached by Congress' because 'it asserts a substantial economic effect on interstate commerce.'" 130 F.3d at 1059–60 (quoting *Lopez*, 514 U.S. at 556 (quoting *Wickard v. Filburn*, 317 U.S. 111, 125 (1942))).

## III

Rancho Viejo does not seriously dispute that *NAHB* is indistinguishable from this case. Rather, plaintiff argues that, as a result of subsequent Supreme Court decisions in *United States v. Morrison*, 529 U.S. 598 (2000), and *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* ("*SWANCC*"), 531 U.S. 159 (2001), *NAHB* is no longer "good law." Appellant's Br. at 9. Before considering plaintiff's argument in detail, we explain why the nature of

[9] For example, in *McClung*, cited with approval in *Lopez*, 514 U.S. at 559, the Court upheld application of Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a *et seq.*, to a local restaurant. 379 U.S. at 303–05. The Court found the application of the statute to be within Congress' commerce power because the restaurant bought 46% of its food, costing approximately $70,000, from a local supplier who obtained it from outside of the state. *Id.* at 296, 298. In part, the *McClung* Court relied on the fact that the amount of food the restaurant procured from out of state, "'taken together with that of many others similarly situated,'" was "'far from trivial.'" *Id.* at 301 (quoting *Wickard v. Filburn*, 317 U.S. 111, 127–28 (1942)). *Cf. Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 744 (1976) (holding that a conspiracy against a North Carolina hospital had "a substantial effect on interstate commerce," and hence was covered by the Sherman Act, because it could, inter alia, reduce the hospital's purchases of out-of-state medicines and supplies).

the Supreme Court's analysis in those decisions makes it highly unlikely that they undermine our circuit precedent.

In *Morrison*, the Court considered a challenge to a section of the Violence Against Women Act, 42 U.S.C. § 13981, which provided a federal civil remedy for victims of gender-motivated violence. Concluding that the case was "controlled by our decision[ ] in *United States v. Lopez*," the Court held that Congress lacked authority to enact the provision under the Commerce Clause. *Morrison*, 529 U.S. at 602. *Lopez*, of course, is the case that controlled this court's decision in *NAHB*. Accordingly, because *NAHB* was based upon *Lopez*, and because *Morrison* made clear that "*Lopez* . . . provides the proper framework for conducting the required analysis," *id.* at 609, it would be quite surprising if *Morrison* under-mined our decision in *NAHB*. *See Norton v. Ashcroft*, 298 F.3d 547, 556 (6th Cir. 2002) ("Rather than breaking new Commerce Clause ground, *Morrison* derived its four-factor framework directly from *Lopez*.").

Rancho Viejo's reliance on *SWANCC* is even further from the mark. In that case, the Supreme Court held, as a matter of statutory construction, that an abandoned gravel pit that provided habitat for migratory birds did not constitute "navigable waters" within the meaning of the Clean Water Act, 33 U.S.C. § 1344(a), and hence was beyond the regulatory authority of the Army Corps of Engineers. 531 U.S. at 167, 171–72. Although the petitioner in *SWANCC* also asked the Court to decide whether Congress *could* exercise such authority under the Commerce Clause if it chose to do so, the Court expressly declined to reach that question. *Id.* at 162. As Rancho Viejo notes, the Court did indicate that if it were to consider the constitutionality of such an exercise, it "would have to evaluate the precise object or activity that, in the aggregate, substantially affects interstate commerce." *Id.* at 173 (quoted in Appellant's Br. at 17). But as we discuss below, identifying the "precise activity" at issue in Rancho Viejo's case only strengthens the conclusion that the take provision of the ESA can constitutionally be applied to plaintiff's construction project.

A

Plaintiff's principal argument is that, although *Lopez* made clear that the first of its four factors was whether the object of regulation was "economic activity," 514 U.S. at 559, *Morrison* "reaffirmed and elaborated upon" that factor in a way that undercuts this circuit's opinion in *NAHB*. Appellant's Br. at 14. We agree that *Morrison* reaffirmed and elaborated upon the first factor, but we see nothing in *Morrison*'s discussion to suggest any dissatisfaction with the way the Court treated the factor in *Lopez*, and hence nothing to undercut our prior reliance on that case. To the contrary, *Morrison* largely proceeded by quoting and paraphrasing *Lopez*'s analysis. *See, e.g.*, 529 U.S. at 610 (noting that in *Lopez*, the Court "observed that § 922(q) was 'a criminal statute that by its terms has nothing to do with "commerce" or any sort of economic enterprise, however broadly one might define those terms' " (quoting *Lopez*, 514 U.S. at 561)).

Rancho Viejo contends that *Morrison* stands for the proposition that whether the regulated activity is economic is not simply a factor in the analysis, but instead is outcome-determinative: that noneconomic activity, whatever its *effect* on interstate commerce, cannot be regulated under the Commerce Clause.[10] Although plaintiff acknowledges that *Morrison* expressly "declined to 'adopt a categorical rule against aggregating the effects of any noneconomic activity' because a categorical rule was unnecessary to the outcome of that case," it argues that the Court "came pretty close" to adopting such a rule. Appellant's Reply Br. at 4 (quoting *Morrison*, 529 U.S. at 613). Because the arroyo toad is not itself "the subject of commercial activity," *id.* at 15, Rancho Viejo argues that regulation of the toad fails *Morrison*'s (and *Lopez*'s) first factor.

---

[10] *But see Terry v. Reno*, 101 F.3d 1412, 1417 (D.C. Cir. 1996) (holding, post-*Lopez* but pre-*Morrison*, that "[t]he regulated activity . . . need not be commercial, so long as its effect on interstate commerce is substantial").

But how close the Court came to embracing plaintiff's view is irrelevant to the disposition of this appeal, because the ESA *regulates takings, not toads*.[11] *Morrison* instructs that "the proper inquiry" is whether the challenge is to "a *regulation of activity* that substantially affects interstate commerce." 529 U.S. at 609 (emphasis added). Similarly, *SWANCC* declares that what is required is an evaluation of "*the precise object or activity* that, in the aggregate, substantially affects interstate commerce." 531 U.S. at 173 (emphasis added). When, as directed, we turn our attention to the precise activity that is regulated in this case, there is no question but that it is economic in nature.

That regulated activity is Rancho Viejo's planned commercial development, not the arroyo toad that it threatens. The ESA does not purport to tell toads what they may or may not do. Rather, section 9 limits the taking of listed species, and its prohibitions and corresponding penalties apply to the persons who do the taking, not to the species that are taken. *See* 16 U.S.C. § 1538(a)(1), (a)(1)(B) (making it "unlawful *for any person . . . to take* any such species") (emphasis added); *id.* § 1540 (providing civil and criminal penalties for "[a]ny person who knowingly violates" the ESA). In this case, the prohibited taking is accomplished by commercial construction, and the unlawful taker is Rancho Viejo.

Nothing in the facts of *Morrison* or *Lopez* suggests that focusing on plaintiff's construction project is inappropriate or insufficient as a basis for sustaining this application of the ESA. Both of those cases involved the regulation of purely noneconomic activity: the statute in *Morrison* regulated gender-motivated violence; the one in *Lopez* regulated gun possession. *See, e.g.*, *Morrison*, 529 U.S. at 610 (noting that "the noneconomic, criminal nature of the conduct at issue was central to our decision in" *Lopez*). Although Rancho Viejo argues that, in fact, the *Lopez* defendant had brought the gun to school in order to sell it, one can examine the Supreme Court's opinion with a microscope without learning that fact.

---

[11] *See* Oral Arg. Tr. at 5 (acknowledgment by plaintiff's counsel that "the regulated activity here [is] the taking of an Arroyo Toad").

It appears only in the lower court's opinion, *see United States v. Lopez*, 2 F.3d 1342, 1345 (5th Cir. 1993), and the Supreme Court attached no significance to it. To the contrary, *Morrison* describes *Lopez* as a case in which "neither the actors nor their conduct ha[d] a commercial character, and neither the purposes nor the design of the statute ha[d] an evident commercial nexus." 529 U.S. at 611 (quoting *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring)).

Here, by contrast, both the "actor," a real estate company, and its "conduct," the construction of a housing development, have a plainly commercial character. So too does the "design" of the statute: the ESA seeks in part to regulate "economic growth and development untempered by adequate concern and conservation," which, Congress found, had the consequence of rendering "various species . . . extinct." 16 U.S.C. § 1531(a)(1). As Judge Henderson wrote in *NAHB*: "It is plain, then, that . . . the Congress contemplated protecting endangered species through regulation of land and its development, which is precisely what the Department has attempted to do here. Such regulation, apart from the characteristics or range of the specific endangered species involved, has a plain and substantial effect on interstate commerce." 130 F.3d at 1059.[12]

### B

Rancho Viejo suggests that even if the regulated activity here is the taking of the toads through economic activity, that fact still does not end the matter. Although the ESA may *regulate* economic activity, plaintiff insists that the statute has

---

[12] In *United States v. Ho*, the Fifth Circuit applied a similar analysis in affirming, against a Commerce Clause challenge, the conviction of a contractor who violated asbestos work practice standards promulgated under the Clean Air Act. 311 F.3d 589, 601–04 (5th Cir. 2002). Focusing on "the regulated intrastate activity, asbestos removal," *id.* at 602, rather than on "the effects of interstate pollution," *id.* at 602 n.12, the court concluded that asbestos removal "is very much a commercial activity in today's economy," *id.* at 602.

a noneconomic *purpose*: the preservation of biodiversity, and, in this case, the preservation of toads that Rancho Viejo maintains are without commercial value. Asserting that to survive Commerce Clause scrutiny a statute must be aimed at economic activity and not simply regulate it for some other purpose, Rancho Viejo concludes that the ESA (at least as applied to its project) must fall. This argument suffers from a number of serious defects.

First, the ESA, like many statutes, has multiple purposes. Whether or not economic considerations were the primary motivation for the Act, there is no question that the commercial value of preserving species diversity played an important role in Congress' deliberations. As Judge Wald described in *NAHB*, "[t]he Committee Reports on the ESA reveal that one of the primary reasons that Congress sought to protect endangered species from 'takings' was the importance of the continuing availability of a wide variety of species to interstate commerce." 130 F.3d at 1050. Likewise, the Fourth Circuit has noted that "[c]ommittee reports and legislative debates have emphasized the importance of endangered species to interstate commerce." *Gibbs*, 214 F.3d at 494 n.3.

Thus, to use a "noneconomic purpose" test to overturn a multi-purpose statute like the ESA, we would have to do so on the ground that economic concerns were not the Act's "true" or "primary" motivation. Such an enterprise is fraught with both difficulty and danger, *see Michael M. v. Super. Ct.*, 450 U.S. 464, 469–70 (1981) (plurality opinion of Rehnquist, J.); *United States v. O'Brien*, 391 U.S. 367, 382–86 (1968), and the Supreme Court has therefore permitted inquiry into legislative purpose in only a narrow class of cases, *see City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 377–78 & n.6 (1991).[13] The enterprise is

---

[13] In *City of Columbia*, Justice Scalia noted that the Court has probed governmental motivation "only in the 'very limited and well-defined class of cases where the very nature of the constitutional question requires [this] inquiry.'" 499 U.S. at 378 n.6 (quoting *O'Brien*, 391 U.S. at 383 n.30). As an example of a case in that limited class, he cited *Village of Arlington Heights v. Metropolitan*

difficult because distilling the true or primary legislative purpose out of the motivations of 435 representatives and 100 senators is inherently problematic. And it is that difficulty that makes the project a dangerous one — dangerous because the indeterminacy of outcome leaves courts open to the charge that they have manipulated the determination of purpose in order to achieve their own policy preferences, and because rejecting a stated congressional purpose as "untrue" reflects considerable disrespect for the pronouncements of a democratically elected branch of government. Is the ESA's true purpose to preserve the economic potential of species whose commercial value we cannot now foresee, or did Congress regard species protection as a moral imperative? Was the Occupational Safety and Health Act enacted to spare the country the loss of productivity occasioned by workplace injury, or to protect the lives of American workers for their own sake? Did Congress pass the Clean Air and Clean Water Acts out of concern that pollution hurts the economy, or out of a fundamental concern for the health of the citizenry? For courts to insist on making these kinds of determinations a prerequisite for upholding the validity of congressional legislation is a recipe for judicial intervention in the political process.

Moreover, the Supreme Court has long held that Congress may act under the Commerce Clause to achieve noneconomic ends through the regulation of commercial activity. The first case in this line is *Champion v. Ames*, in which the Court upheld the constitutionality of a statute prohibiting the interstate transportation of lottery tickets, notwithstanding that Congress passed the statute "for the protection of public morals." 188 U.S. 321, 355–57 (1903). "We should hesitate long," the Court said, "before adjudging that an evil of such appalling character, carried on through interstate commerce, cannot be met and crushed by the only power competent to that end." *Id.* at 357–58. Ten years later, citing *Champion*, the Court rejected a Commerce Clause attack on the Mann Act, which prohibited the transportation of women in inter-

---

*Housing Development Corp.*, 429 U.S. 252, 268 & n.18 (1977), a case involving "race-based motivation." 499 U.S. at 378 n.6.

state commerce "for immoral purposes." *Hoke v. United States*, 227 U.S. 308, 317, 320 (1913). The Court rejected the defendant's claims that the act was "a subterfuge and an attempt to interfere with the police power of the states to regulate the morals of their citizens." *Id.* at 321. "[T]he powers reserved to the states *and* those conferred on the nation," the Court said, "are adapted to be exercised, whether independently or concurrently, to promote the general welfare, material and moral." *Id.* at 322 (emphasis added).

The Supreme Court briefly departed from this line in *Hammer v. Dagenhart*, enjoining, on Commerce Clause grounds, the enforcement of a 1916 federal statute excluding the products of child labor from interstate commerce. 247 U.S. 251, 277 (1918). Over Justice Holmes' dissent, the Court held the statute unconstitutional because "[t]he thing intended" was not regulation of "transportation among the states," but rather "standardiz[ation] [of] the ages at which children may be employed in mining and manufacturing." *Id.* at 271–72. But *Hammer* was expressly overruled in *United States v. Darby*, in which the Court upheld the Fair Labor Standards Act's prohibition on the shipment in interstate commerce of products produced by employees whose wages or hours did not conform to the Act's requirements. 312 U.S. 100, 116–17 (1941). "The motive and purpose of a regulation of interstate commerce," the Court declared, "are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control." *Id.* at 115.

Since then, the Supreme Court has never held an exercise of Congress' commerce power unconstitutional on the ground that the legislature had a noneconomic purpose. Perhaps the most important of the subsequent cases is *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261–62 (1964), in which the Court rebuffed a Commerce Clause attack on Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a *et seq.* The Court acknowledged that "[t]he Senate Commerce Committee made it quite clear that the fundamental object of Title II was to vindicate the deprivation of personal dignity that

surely accompanies denials of equal access to public establishments." *Id.* at 250 (internal quotation marks omitted). But the fact that Congress passed the statute to attack the moral outrage of racial discrimination did not lead the Supreme Court to find it unconstitutional. To the contrary, citing several of the cases discussed above, the Court held that the fact "[t]hat Congress was legislating against moral wrongs . . . render[s] its enactments no less valid." *Id.* at 257; *see id.* at 256–57.

The position urged by Rancho Viejo puts the constitutionality of many of the above-described statutes at risk. And they are hardly the only ones. Congress' primary object in passing product safety legislation, for example, was not to improve the productivity of industry but rather to protect the well-being of the public.[14] Much the same can be said of federal environmental legislation.[15] And plaintiff's position would make federal criminal law an area of particular vulnerability. Surely statutes proscribing the use or possession of explosives, of weapons of mass destruction, and of firearms by convicted felons, were not passed merely (or even primarily) to protect commercial property — but to protect lives.[16] Nor did Congress bar the murder of public safety officers because

---

[14] *See, e.g.*, Consumer Product Safety Act, 15 U.S.C. § 2051(b)(1) (declaring that the first purpose of the Act is "to protect the public against unreasonable risks of injury associated with consumer products"); National Traffic and Motor Vehicle Safety Act of 1966, 49 U.S.C. § 30101 (stating that "the purpose of this chapter is to reduce traffic accidents and deaths and injuries resulting from traffic accidents").

[15] *See, e.g.*, *Hodel v. Indiana*, 452 U.S. 314, 329 (1981) (noting that "Congress adopted the Surface Mining Act in order to ensure that production of coal for interstate commerce would not be at the expense of agriculture, the environment, or public health and safety").

[16] *See, e.g.*, Homeland Security Act of 2002, Pub. L. No. 107-296, § 1123, 116 Stat. 2135, 2283–85 (amending 18 U.S.C. § 842(i), which had prohibited certain categories of persons from receiving or possessing any explosive that has been shipped "in interstate commerce," by inserting "or affecting" before "interstate"); 18 U.S.C.

it was concerned about the economic impact of their deaths,[17] or the shipment of child pornography because it thought that the market for such materials was suboptimal.[18]

It is true that Congress has tied the application of many of these statutes to jurisdictional hooks. But there are many other criminal statutes that are not so tied. *See, e.g.*, 21 U.S.C. § 841(a) & (b)(1)(A)(iv) (making it unlawful to possess with intent to distribute 100 grams of PCP). Moreover, as we have noted above, a jurisdictional element is not critical to a statute's constitutionality as long as there is other evidence that interstate commerce is substantially affected. *See supra* Part II.B. Rancho Viejo offers no reason to regard a noneconomic purpose as acceptable if tied to a jurisdictional hook, but unacceptable if effectuated — as it is here — through the direct regulation of commercial activity.[19]

---

§ 2332a (making it unlawful to use a weapon of mass destruction against any person within the United States where the results of such use "affect interstate . . . commerce"); *id.* § 844(o) (barring the transfer of explosive materials with knowledge that they will be used to commit a crime of violence); *id.* § 922(g) (making it unlawful for a convicted felon to possess a firearm "in or affecting commerce").

[17] *See, e.g.*, 18 U.S.C. § 844(d) (setting penalties for receiving an explosive in interstate commerce with intent to kill or injure, where injury or death results to any person, including a public safety officer).

[18] *See, e.g.*, 18 U.S.C. § 2252A (criminalizing the transportation of child pornography in interstate commerce); *see also United States v. Kallestad*, 236 F.3d 225, 228 (5th Cir. 2000) (upholding a federal statute prohibiting the possession of child pornography on the ground of substantial effect on interstate commerce).

[19] Similarly, it is also true that the cases in the *Champion/Hoke/Darby/Heart of Atlanta* line can be described as falling within the first *Lopez* category — the regulation of the use of the channels of interstate commerce. *See Morrison*, 529 U.S. at 609 (citing *Darby* and *Heart of Atlanta* as examples of that category of cases). But the demarcation between the *Lopez* categories is far from clear. For example, the Court has repeatedly referred to *Heart of Atlanta* (and its companion case, *Katzenbach v. McClung*)

There is nothing in *Morrison* or *Lopez* to put the *Champion/Hoke/Darby/Heart of Atlanta* line of precedent in doubt. Indeed, both decisions repeatedly cite *Darby* and *Heart of Atlanta*. *See, e.g.*, *Morrison*, 529 U.S. at 609, 610, 614; *Lopez*, 514 U.S. at 555, 556, 557, 558, 559. *Morrison* did overturn a statute that was passed with a moral purpose: protecting women against violent crime. But unlike the ESA, the Violence Against Women Act sought to achieve its objective by regulating an activity — gender-motivated violence — that the Court found was not "in any sense of the phrase, economic activity." *Morrison*, 529 U.S. at 613. Similarly, the Gun-Free School Zones Act sought to achieve its noneconomic purpose — the preemption of potential gun violence near schools — by regulating conduct, "[t]he possession of a gun in a local school zone," that was "in no sense an economic activity." *Lopez*, 514 U.S. at 573–74 (quoted in *Morrison*, 529 U.S. at 610). Thus, neither case precludes the conclusion that it is constitutional to apply the ESA to a commercial construction project like Rancho Viejo's. And a court must hesitate before extending those two cases, neither of which involved economic regulation of any kind, to require the unraveling of a vast fabric of Supreme Court precedent and congressional legislation.

## C

Rancho Viejo next argues that even if the taking regulated in this case is commercial in character, the ESA bans other takings that are not. Because the ESA's prohibition on takings applies as much to a hiker's "casual walk in the woods" as to the commercial activities of a real estate company, Rancho Viejo contends that the statute cannot constitu-

---

as also falling within the third category — the regulation of activities having a substantial relation to interstate commerce. *See Morrison*, 529 U.S. at 610; *Lopez*, 514 U.S. at 559. Moreover, Rancho Viejo again proffers no reason why it would be permissible for Congress to have a noneconomic purpose when regulating the use of the channels of interstate commerce but impermissible when regulating activities having a substantial relation to interstate commerce.

tionally be applied to its taking of arroyo toads. Appellant's Reply Br. at 5. Plaintiff's "overbreadth" argument is unavailing.

In *Lopez*, the Supreme Court noted that "where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." 514 U.S. at 558 (emphasis omitted) (quoting *Maryland v. Wirtz*, 392 U.S. 183, 196 n.27 (1968)). Hence, because much activity regulated by the ESA does bear a substantial relation to commerce, it may well be that the hiker hypothetical proffered by the plaintiff is "of no consequence" to the statute's constitutionality. *See Hodel v. Indiana*, 452 U.S. 314, 329 n.17 (1981) ("A complex regulatory program . . . can survive a Commerce Clause challenge without a showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies [the Commerce Clause] test.").[20]

But we need not decide that question here because there is a more basic answer to Rancho Viejo's hiker hypothetical: it is not this case. Plaintiff characterizes its complaint as "fundamentally . . . an as-applied challenge to the constitutionality of the Defendants' regulation of the 'taking' of Arroyo toads under the ESA." Complaint ¶ 2. And as we have already discussed, the particular application before us involves the regulation of Rancho Viejo's commercial real estate development, which falls well within the powers granted Congress under the Commerce Clause.

At oral argument, Rancho Viejo asserted that it has a different kind of "as-applied" challenge in mind. Plaintiff's

---

[20] It may also be that application of the ESA to hikers or toad hunters can be sustained on the other rationale relied on in *NAHB*, "that the loss of biodiversity itself has a substantial effect on our ecosystem and likewise on interstate commerce." 130 F.3d at 1058 (Henderson, J., concurring); *see Gibbs*, 214 F.3d at 497 (citing *NAHB*).

objection, it said, is not confined to the application of the ESA to its development project, but "to the listing of this particular endangered species," the arroyo toad. Oral Arg. Tr. at 5. In effect, plaintiff explained, "[w]e are facially challenging the listing of the arroyo toad." *Id.* at 20. But this curious characterization is simply the plaintiff's attempt to have its cake and eat it too. The company would like us to consider its challenge to the ESA only as applied to the arroyo toad, which it says has no "known commercial value" — unlike, for example, Mark Twain's celebrated jumping frogs of Calaveras County. Appellant's Reply Br. at 9; *see* Appellant's Br. at 20–21. Yet it would also like us to regard that narrow challenge as a facial one, unconstrained by the fact that plaintiff is a commercial developer.

This artificially constructed "facial" challenge must fail. As the Supreme Court held in *United States v. Salerno*, to mount a successful facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the . . . Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." 481 U.S. 739, 745 (1987).[21] Because Rancho Viejo's own case represents a "set of circumstances" under which the ESA may constitutionally be applied — even to the lowly arroyo toad — plaintiff cannot shoulder the "heavy burden" required to prevail in a facial challenge. *Id.* In effect, Rancho Viejo seeks to trade the

---

[21] *See S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (applying *Salerno* to a Commerce Clause challenge and holding that the plaintiff "must establish that no set of circumstances exists under which the [challenged ordinance] would be valid" (internal quotation marks omitted)); *United States v. Sage*, 92 F.3d 101, 106 (2d Cir. 1996) (same); *see also AMFAC Resorts v. U.S. Dep't of Interior*, 282 F.3d 818, 826 (D.C. Cir. 2002) (noting that this circuit has repeatedly "invoked *Salerno*'s no-set-of-circumstances test to reject facial constitutional challenges"), *cert. granted on other grounds sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 123 S.Ct. 549 (2002).

shoes of a commercial developer for those of a weekend hiker. But permitting plaintiff to stand in the hiker's shoes would mean recognizing the kind of overbreadth challenge the Supreme Court has expressly forsworn.

Before leaving this point, we further note that the constitutional circumstances we rely on here — takings by commercial developers — are neither an unintended nor an insignificant portion of the activities regulated by the ESA. In that statute, "Congress expressly found that 'economic growth and development untempered by adequate concern and conservation' was the cause for 'various species of fish, wildlife, and plants in the United States hav[ing] been rendered extinct.'" *NAHB*, 130 F.3d at 1059 (Henderson, J., concurring) (quoting 16 U.S.C. § 1531(a)(1)). Moreover, as Secretary Norton points out, "the activities that cause the loss of endangered species and that are regulated by the take prohibition are themselves generally commercial and economic activities." Appellees' Br. at 34. Finally, in listing the arroyo toad as an endangered species, the FWS specifically found that "[d]evelopment projects in riparian wetlands have caused permanent losses of riparian habitats and are the most conspicuous factor in the decline of the arroyo toad." 59 Fed. Reg. at 64,863. Because Congress has constitutional authority to regulate such development projects, Rancho Viejo's complaint fails regardless of whether it is characterized as an as-applied or facial challenge.

D

Finally, Rancho Viejo draws our attention to *Morrison*'s declaration that "[t]he Constitution requires a distinction between what is truly national and what is truly local." 529 U.S. at 617–18. Plaintiff argues that the ESA represents an unlawful assertion of congressional power over local land use decisions, which it describes as an area of traditional state regulation. The ESA, however, does not constitute a general regulation of land use.[22] Far from encroaching upon territo-

---

[22] *Cf. California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 587 (1987) (stating that "the core activity described by" land

ry that has traditionally been the domain of state and local government, the ESA represents a national response to a specific problem of "truly national" concern.

In making these points, we can do little to improve upon the Fourth Circuit's opinion in *Gibbs*, which upheld, as a valid exercise of federal power under the Commerce Clause, an FWS regulation that limited the taking of red wolves. 214 F.3d at 487. As Chief Judge Wilkinson explained, regulation of the taking of endangered species "does not involve an 'area of traditional state concern,' one to which 'States lay claim by right of history and expertise.'" *Id.* at 499 (quoting *Lopez*, 514 U.S. at 580, 583 (Kennedy, J., concurring)). Rather, as the Supreme Court acknowledged in *Minnesota v. Mille Lacs Band of Chippewa Indians*, "[a]lthough States have important interests in regulating wildlife and natural resources within their borders, this authority is shared with the Federal Government when the Federal Government exercises one of its enumerated constitutional powers." 526 U.S. 172, 204 (1999). Moreover, while "states and localities possess broad regulatory and zoning authority over land within their jurisdictions, . . . [i]t is well established . . . that Congress can regulate even private land use for environmental and wildlife conservation." *Gibbs*, 214 F.3d at 500. Tracing a hundred-year history of congressional involvement in natural resource conservation, Chief Judge Wilkinson concluded that "it is clear from our laws and precedent that federal regulation of endangered wildlife does not trench impermissibly upon state powers." *Id.* at 500–01.

The Fourth Circuit also recognized the national scope of the problem posed by species conservation. Citing the ESA's legislative history, the court noted Congress' concern that " 'protection of endangered species is not a matter that can be handled in the absence of coherent national and international

use planning and environmental regulation "is undoubtedly different," because "environmental regulation . . . does not mandate particular uses of the land but requires only that, however the land is used, damage to the environment is kept within prescribed limits").

policies: the results of a series of unconnected and disorganized policies and programs by various states might well be confusion compounded.'" *Gibbs*, 214 F.3d at 502 (quoting H.R. REP. NO. 93-412, at 7 (1973)). As the *Gibbs* court explained: "States may decide to forego or limit conservation efforts in order to lower these costs, and other states may be forced to follow suit in order to compete." *Id.* at 501. Our court has recognized this problem as well. *See NAHB*, 130 F.3d at 1055 (Wald, J.) (noting that states may be "motivated to adopt lower standards of endangered species protection in order to attract development"). And the Supreme Court, as the Fourth Circuit observed, "has held that Congress may take cognizance of this dynamic and arrest the 'race to the bottom' in order to prevent interstate competition whose overall effect would damage the quality of the national environment." *Gibbs*, 214 F.3d at 501 (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981)).[23]

For these reasons, the protection of endangered species cannot fairly be described as a power "which the Founders denied the National Government and reposed in the States." *Morrison*, 529 U.S. at 618. Rather, "the preservation of endangered species is historically a federal function," *Gibbs*, 214 F.3d at 505, and invalidating this application of the ESA "would call into question the historic power of the federal government to preserve scarce resources in one locality for the future benefit of all Americans," *id.* at 492. We therefore agree with Chief Judge Wilkinson that to sustain challenges of this nature "would require courts to move abruptly from

---

[23] *See Hodel v. Virginia Surface Mining*, 452 U.S. at 268, 281–82 (rejecting a claim that the Surface Mining Control and Reclamation Act exceeds Congress' Commerce Clause power because it regulates local land use, noting that the Act responds to congressional concern that "nationwide 'surface mining and reclamation standards are essential in order to insure that competition in interstate commerce . . . will not be used to undermine the ability of the several States to improve and maintain adequate standards,'" and holding that "[t]he prevention of this sort of destructive interstate competition is a traditional role for congressional action under the Commerce Clause" (quoting 30 U.S.C. § 1201(g))).

preserving traditional state roles to dismantling historic federal ones." *Id.* at 504.

## IV

"Due respect for the decisions of a coordinate branch of Government demands that we invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds." *Morrison*, 529 U.S. at 607 (citations omitted). Rancho Viejo has not made that "plain showing" here. Rather, its attack on the constitutionality of the application of the ESA to its commercial housing development is indistinguishable from the attack we turned back in *NAHB*, and nothing in subsequent Supreme Court jurisprudence has undermined the precedential authority of that decision. Accordingly, *NAHB* controls our decision in this case, and the district court's grant of summary judgment in favor of Secretary Norton is therefore

*Affirmed.*

1

GINSBURG, *Chief Judge*, concurring: Although I do not disagree with anything in the opinion of the court, I write separately because I do not believe our opinion makes clear, as the Supreme Court requires, that there is a logical stopping point to our rationale for upholding the constitutionality of the exercise of the Congress's power under the Commerce Clause here challenged. *See Lopez*, 514 U.S. at 564 ("if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate"); *Morrison*, 529 U.S. at 615-16; *see also United States v. Wall*, 92 F.3d 1444, 1455-56 (6th Cir. 1996) (Boggs, J., dissenting in part) ("the rationale offered to support the constitutionality of the statute . . . has a logical stopping point, so that the rationale is not so broad as to regulate on a similar basis all human endeavors, especially those traditionally regulated by the states").

In this case I think it clear that our rationale for concluding the take of the arroyo toad affects interstate commerce does indeed have a logical stopping point, though it goes unremarked in the opinion of the court. Our rationale is that, with respect to a species that is not an article in interstate commerce and does not affect interstate commerce, a take can be regulated if – but only if – the take itself substantially affects interstate commerce. The large-scale residential development that is the take in this case clearly does affect interstate commerce. Just as important, however, the lone hiker in the woods, or the homeowner who moves dirt in order to landscape his property, though he takes the toad, does not affect interstate commerce.

Without this limitation, the Government could regulate as a take any kind of activity, regardless whether that activity had any connection with interstate commerce. With this understanding of the rationale of the case, I concur in the opinion of the court.